573 F.2d 869
 Louis E. SUMMERS, Plaintiff-Appellee Cross-Appellant,
v.
Patricia Roberts HARRIS, Secretary of the United States
Department of Housing and Urban Development,
Defendant-Appellant Cross-Appellee.
 No. 76-1193.
 United States Court of Appeals,
Fifth Circuit.
 May 26, 1978.
 
 Robert E. Kopp, Marta W. Berkley, Attys., Civ. Div., Dept. of Justice, Washington, D. C., for defendant-appellant cross-appellee.
 P. Albert Bienvenu, Jr., P. A. Bienvenu, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for National Flood Insurers Association (original defendant).
 Gordon M. White, Baton Rouge, La., for plaintiff-appellee cross-appellant.
 Appeals from the United States District Court for the Middle District of Louisiana.
 Before CLARK and GEE, Circuit Judges, and LYNNE*, District Judge.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 Louis E. Summers brought this action against the National Flood Insurers Association[1] to recover on a policy of flood insurance issued pursuant to the National Flood Insurance Act of 1968, 42 U.S.C.A. § 4001 et seq. The policy purported to cover the plaintiff's house and its contents against all direct loss by flood and showed its effective date to be April 25, 1973. The district judge, sitting without a jury, considered the only substantial issue in the case to be whether the flood damaged Summers' house before the policy was issued. He found as a matter of fact that it did not and held for Summers. On this appeal the National Flood Insurers Association attacks that finding of fact as being clearly erroneous and contends in addition that the policy was void since the flood was in progress before the policy was issued. Summers cross-appeals from the district judge's denial of attorney's fees and penalties provided by Louisiana insurance law and from his denial of prejudgment interest.[2] Agreeing with the defendant that the "loss in progress" principle prevents recovery on this policy, we reverse.
 
 
 2
 Summers' house was located in the Pointe Coupee Loop, an area of some 80,000 acres completely encircled by levees in Pointe Coupee Parish, Louisiana. Under normal conditions, water in the loop drains from north to south, the sole outlet being the Pointe Coupee Drainage Structure, which is approximately 2 1/2 miles south of Summers' house. Due to heavy rains prior to April 17, 1973, the drainage structure was opened to allow water to drain from the loop.
 
 
 3
 The Morganza Floodway, which carries flood waters from the Mississippi River to the Atchafalaya River, borders the Pointe Coupee Loop to the southeast. Early in the morning on April 17, the Morganza Control Structure was opened to allow water to flow through the Morganza Floodway. Late that afternoon it was discovered that the Pointe Coupee Drainage Structure was jammed open and could not be completely closed. Since the water level in the floodway was higher than the water level and ground level to the north, water began to back up through the Pointe Coupee Drainage Structure and into the Pointe Coupee Loop in a south to north direction. When this problem was discovered, the Morganza Control Structure was closed to allow the Pointe Coupee Drainage Structure to be closed.
 
 
 4
 The Morganza Floodway was reopened on April 18 or 19. Whether the Pointe Coupee Drainage Structure had been closed by that time was disputed at trial. One witness testified that it was closed on April 18; another witness testified that the structure was never completely closed due to a log jamming it open. In any event, there was some backflow of water and the trial judge's finding that this backflow contributed to the damage to Summers' house is not clearly erroneous.
 
 
 5
 Two gauges near the Pointe Coupee Drainage Structure showed the water level near the mouth of the loop rose approximately ten feet between April 16 and April 18. The problem begun by this backflow was compounded by severe rains in this area. Beginning on April 16 and continuing through the next several days, approximately 13 inches of rain fell in this vicinity. Between April 18 and April 25, the water level at the location of the Pointe Coupee gauges rose approximately two more feet.
 
 
 6
 On April 23 the area where Summers lived became eligible to participate in the national flood insurance program. On April 25 Summers applied for the flood insurance policy covering his residence and its contents. The evidence presented at trial was tailored to answer the question of where the water was with respect to Summers' house on April 25.
 
 
 7
 The evidence showed that Summers' house was constructed on two levels. Although the garage was attached to and located under the same roof as the rest of the house, the garage floor, which was approximately at ground level, was 27 inches below the finished floor inside the house. The outside of the house was a brick veneer which extended from the ground up, and steps led from the ground to the front door.
 
 
 8
 At trial several eyewitnesses called by Summers testified without contradiction that water was not up to the finished level on April 25. Summers testified that he visited the house on April 20. He parked his car on the road in front of his house and paddled a boat across the area of water which then stood in his front yard. The water stopped a few feet from his house and was not yet in the carport or under the house. He returned on April 28, and although the water was in the carport and up into the floor joists, it had not yet reached the finished floor. He returned again on April 30, and found the water 1/2 to 3/4 inch above the finished floor.
 
 
 9
 Several other witnesses observed Summers' house on April 24. One testified that the water was not yet touching the house; another testified that there was a little water in the garage; and still another testified that the water was six to ten inches below the floor level of the house. None of the witnesses placed the water level inside the living quarters of the house on that date.
 
 
 10
 Summers also presented an expert who was of the opinion that the flooding of Summers' house could be explained in part by the water backing up from the Pointe Coupee Drainage Structure. That expert also testified that gauge readings at the Pointe Coupee Drainage Structure would not be accurate indicators of the water level at Summers' house. Due to bottlenecks in the drainage routes, he opined that it would take several days for the water at Summers' house to reach the level recorded at the gauges near the drainage structure 2 1/2 miles away.
 
 
 11
 The expert who testified on behalf of the National Flood Insurers Association was of the opinion that the water level had equalized before April 25. Therefore, his opinion was that the gauge readings at the drainage structure were accurate indicators of the water level at Summers' house. These gauge readings suggested that the water entered the carport on April 18, reached the bottom of the floor joists on April 20, and reached the finished floor on April 24 or 25.
 
 
 12
 The trial judge considered the eyewitness testimony, together with the testimony regarding the time lag for the water level to equalize, more convincing than the reading of gauges 2 1/2 miles away from Summers' home and found as a matter of fact that the water had not reached a damaging height insofar as Summers' property was concerned by April 25. Since the plaintiff applied for flood insurance before the water reached the floor, the trial judge held as a matter of law that the damage to Summers' house was covered by the policy. By way of dicta the trial judge stated that nothing in the policy would have excluded coverage even if the water had touched the floor before the policy became effective.
 
 
 13
 Although the trial judge's findings of fact must be upheld on appeal since they are not clearly erroneous, his holding that Summers had coverage because he won the race with the waters was error. Since the trial of this case, this circuit in another flood insurance case has held that when a loss already is in progress at the time a policy is issued, the contract of insurance does not take effect. Drewett v. Aetna Casualty & Surety Co., 539 F.2d 496 (5th Cir. 1976); accord, Presley v. National Flood Insurers Association, 399 F.Supp. 1242 (E.D.Mo.1975). In Drewett the insured's house rested on wooden stilts above the ground. The plaintiff secured insurance at a time when the water was a few feet up the stilts but before the water had reached the living quarters of the house. A few days after the policy was issued, a levee broke, causing the water to rise further and enter the living quarters. This court held the "loss in progress" principle applicable to policies issued under the national flood insurance program and denied recovery to the plaintiff.
 
 
 14
 Drewett makes it clear that Summers is not entitled to recover on his flood insurance policy issued April 25. As the district judge noted, flooding in this area was in progress as early as April 17 when the Morganza Floodway was opened as flooding rains were falling. This flooding posed an immediate threat to Summers' house at least as early as April 20, when Summers had to travel from the road to his house by boat. The flood water that entered Summers' house after April 25 was a continuation of the flooding process that began on April 17, so it is clear that the loss was in progress within the meaning of Drewett before the policy became effective. In fact, Summers' case for recovery is not as strong as was Drewett's, for although a flood was in progress at the time Drewett took out his policy, it was not until a levee broke later that the water actually reached its damaging height. Here the flood in progress on April 25 when Summers applied for coverage was not assisted in damaging Summers' house by an aggravating event which occurred after the policy was issued.
 
 
 15
 In finding coverage the district judge relied heavily on the fact that flood insurance under the emergency program became available in the area where Summers lived on April 23. Although normally there is a 15-day waiting period between the date of application and the date a policy is issued, in this case the waiting period was waived. Because the National Flood Insurers Association made insurance available on April 23 with an immediate effective date, the trial judge reasoned that they must have intended to insure against this particular flood hazard knowing it was already in progress. However, nothing stated in the purpose for or operation of the emergency program demonstrates or suggests that the insurer must reimburse persons for losses which have already begun at the time they apply for insurance.
 
 
 16
 Congress in the National Flood Insurance Act of 1968 instructed the Secretary of Housing and Urban Development (HUD) to make flood insurance available only in areas evidencing a positive interest in securing insurance and assuring adoption of land use and control measures for flood plain management consistent with federal standards. 42 U.S.C.A. § 4012(c). The Secretary of HUD has promulgated a laundry-list of actions that must be taken by a community to become eligible for the program, 24 C.F.R. § 1909.22 (1977), and also the criteria for determining the adequacy of a community's flood plain management regulations. 24 C.F.R. § 1910.1-8 (1977). In addition, the 1968 Act required that insurance premium rates be based on a study of the risks in the area and accepted actuarial principles. 42 U.S.C.A. §§ 4014, 4015. Until these flood hazard evaluation and rate studies for a community were completed, premium rates could not be set and insurance was not available in that community.
 
 
 17
 To prevent these detailed studies from causing delay in providing insurance, Congress in 1969 authorized the emergency flood insurance program. Housing and Urban Development Act of 1969, Pub.L. No. 91-152, tit. IV, § 408,83 Stat. 379, 396 (Codified at 42 U.S.C.A. § 4056). This enactment is explained in 24 C.F.R. § 1909.3 (1977):
 
 
 18
 The 1968 Act required a risk study to be undertaken for each community before it could become eligible for the sale of flood insurance. Since this requirement resulted in a delay in providing insurance, the Congress . . . established an Emergency Flood Insurance Program as a new Section 1336 of the National Flood Insurance Act (42 U.S.C. 4056) to permit the early sale of insurance in flood-prone communities. The emergency program, which under existing law extends to September 30, 1977, does not affect the requirement that a community must adopt adequate flood plain management regulations pursuant to Part 1910 of this subchapter but permits insurance to be sold before a study is conducted to determine risk premium rates for the community.
 
 
 19
 It is apparent, therefore, that this program is designed not to make flood insurance available during a pending emergency, but rather to make it available in an area when all requirements of eligibility have been met except for the completion of a time-consuming study to estimate risk premium rates.
 
 
 20
 The waiver of the 15-day waiting period in this case likewise is not indicative of an intent to make insurance available to cover losses caused by an ongoing flood. 24 C.F.R. § 1911.11(c) (1977) addresses the time that a flood insurance policy becomes effective:
 
 
 21
 The effective date and time of any new or added coverage, or of any increase in the amount of coverage, shall be 12:01 am (standard time) of the 16th calendar day after the date of the application, provided that this waiting period is waived during the 30 day period following both the date of initial community eligibility in the emergency and regular programs.
 
 
 22
 That the 15-day waiting period was waived in this case is a function of the community's initial eligibility in the program on April 23, not a function of any determination that immediate effectiveness was necessary because this particular flood was in progress.
 
 
 23
 The issuance of Summers' policy under the emergency program, therefore, does not abrogate the principles established in Drewett. Since the flood that damaged Summers' house was in progress on the day that he applied for his flood insurance policy, the contract of insurance could not take effect. We reverse the district court's judgment and remand for the district judge to order the defendant to return to Summers the premium he paid.
 
 
 24
 REVERSED and REMANDED.
 
 
 
 *
 Senior District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 The original defendants, in addition to the National Flood Insurers Association, were the United States, Aetna Casualty & Surety Company, and Albert M. Summers. The United States was dismissed since nothing in the jurisdictional statutes pleaded by the plaintiff authorized a suit against the United States, and Aetna and Albert Summers were dismissed by stipulation with the plaintiff as allowed by Fed.R.Civ.P. 41(a)(1)
 On April 5, 1978, Patricia Roberts Harris, Secretary of the Department of Housing and Urban Development (HUD), was substituted as party-appellant in the place of the National Flood Insurers Association. In conjunction with its undertaking on January 1, 1978, the operation of all the insurance aspects of the flood insurance program previously performed by the Association, the Department of HUD agreed to assume responsibility for the continuation of coverage under policies previously issued by the Association, including the defense of pending claims under those policies. This change in parties has no effect on the outcome of this case.
 
 
 [2]
 Because of our disposition of the appeal, we have no occasion to reach the issues raised on cross-appeal. These issues were addressed in West v. Harris, 573 F.2d 873, 879 (5th Cir. 1978), which was orally argued at the same time as this case