**NEW CASTLE COUNTY, Plaintiff,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, et al., Defendants.**

Civ. A. No. 85–436–JLL.

United States District Court, D. Delaware.

March 31, 1988.

Susan C. Del Pesco and Catherine J. Sponseller of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for plaintiff New Castle County.

John G. Mulford and Brian A. Sullivan of Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, Del., for defendant Continental Cas. Co.

Edmund D. Lyons, Jr., of Aerenson, Ferrara & Lyons, Wilmington, Del., Dennis M. Flannery, A. Stephen Hut, Jr., and Alan S. Tenenbaum of Wilmer, Cutler & Pickering, Washington, D.C., and Clifford B. Hendler and Sean M. Fitzpatrick of Colton and Boykin, Washington, D.C., of counsel, for defendant Ins. Co. of North America.

Gary W. Aber of Heiman and Aber, Wilmington, Del., James E. Rocap III, Thomas B. Carr, and Stephen L. Nightingale of Miller, Cassidy, Larroca & Lewin, Washington, D.C., of counsel, for defendant Aetna Cas. and Sur. Co.

William J. Cattie III and Roger D. Landon of Heckler & Cattie, Wilmington, Del., for defendant U.S. Fire Ins. Co.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

New Castle County (the "County") filed this action requesting a declaratory judgment against twelve insurance companies which had issued comprehensive general liability policies to the County. (Docket Item ["D.I."] 1.) The County seeks a declaration that the insurance companies must defend and indemnify the County for claims relating to groundwater pollution emanating from two landfills utilized by the County. The insurers answered by denying coverage for the claims and asserting affirmative defenses. (D.I. 6, 7, 10–14, 25, 28, 40.) Several insurers also filed counterclaims and crossclaims. The County has settled its claims against seven of the insurers.[1] (D.I. 45, 124, 148, 245, 355, 362, 373.)

The insurers filed motions for summary judgment, asserting that they had no duty to defend or indemnify the County for claims for pollution emanating from the

landfills. Two of the issues raised in the motions for summary judgment, the scope of the policies' pollution exclusion clause and the scope of the provision limiting coverage to "damages," were argued to the Court on October 8, 1987. The Court denied the insurers' motions for summary judgment on those two issues.[2] *New Castle County v. Hartford Accident & Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987).

Presently before the Court are all the remaining grounds for summary judgment. Defendant Aetna Casualty and Surety Company ("Aetna") seeks summary judgment on three grounds: (a) that the County failed to disclose material facts regarding Llangollen landfill leachate contamination when it purchased Aetna's policies, (b) that the pollution at issue did not result from an "occurrence" as defined by the policy, and (c) that the County failed to give proper notice to Aetna of the alleged occurrence and resulting claims against the County. (D.I. 109, 336.) New Castle County, in a cross-motion for summary judgment against Aetna, asserts that Aetna waived its right to charge that the County misrepresented material facts when it applied for insurance. (D.I. 232.) The Insurance Company of North America ("INA") and United States Fire Insurance Company ("U.S. Fire") seek summary judgment on the basis of the occurrence issue, the notice issue, and on the grounds that the County failed to take appropriate steps to mitigate its losses. (D.I. 338, 340.) Finally, Continental Casualty Company ("CNA") requests summary judgment on the occurrence and notice issues.[3] (D.I. 227.) For reasons set out below, the Court will grant partial summary judgment to Aetna, INA, U.S. Fire, and CNA, and will deny the County's motion for partial summary judgment.

1. The seven insurers that settled are: Zurich Insurance Company, New Hampshire Insurance Company, Continental Insurance Company, Hartford Accident and Indemnity Company, National Union Fire Insurance Company, Home Insurance Company, and Twin Fire Insurance Company.

2. The Court did grant partial summary judgment to one defendant, United States Liability Insurance Company, as the Company had issued

policies covering three years that contained an absolute pollution exclusion clause. U.S. Liability remains a defendant for two other years when its policies contained a pollution exclusion clause that was identical to those used by the other defendants.

3. The fifth remaining defendant, U.S. Liability, has not filed for summary judgment on any of the above issues.

## II. BACKGROUND

### A. *Llangollen Landfill*

The Llangollen landfill site opened in the Fall of 1960 and was used as the primary municipal solid waste disposal site in New Castle County. The site covered sixty-five acres of land rented by the County. (D.I. 392A at 671–91.) The County subsequently purchased the land in September, 1962. (*Id.* at 739–41.) The landfill was operated first by Landfill, Inc., and later by Material Transit, Inc., until the landfill closed in 1968. (*Id.* at 671–91.)

The parties paint contrasting pictures as to the amount of diligence used in operating the landfill. The record reflects that the operation of the landfill prompted occasional protests from local citizens and public officials. (D.I. 339A at 11–14.) Chief among the complaints was that refuse was not properly covered with dirt, leading to problems with odors, rodents and smoldering fires. (*Id.*) In addition, refuse was dumped into standing water. (*Id.* at 21.) Local residents filed for a preliminary injunction to prevent the continued operation of the landfill. While finding that there was evidence of garbage being left uncovered and trash being dumped into water, the Delaware Chancery Court found that on the whole the operation of the landfill was "satisfactory in most respects and in accordance with established sanitary landfill practices." *Pruett v. Dayton,* 168 A.2d 543, 546 (Del.Ch.1961). As the site began to reach capacity, excavation was performed which removed part of the layer of clay beneath the landfill. (D.I. 339A at 21.) This created problems because the layer of clay was what would normally prevent the leachate generated by the landfill from penetrating into the underlying groundwater. (*Id.*) However, the County asserts that the owner performed all the excavation and that the leachate would not have been drawn into the underlying aquifer had it not been for an increase in pumping of water out of the aquifer by a nearby water company and a neighboring industry. (D.I. 392 at 44.)

On May 18, 1972, more than three years after the landfill closed, the County received a letter from the State Department of Natural Resources and Environmental Control ("DNREC") stating that Mrs. Reni's well, which was near the Llangollen landfill, was contaminated. (D.I. 109A at 66–67.) DNREC said that its investigation revealed that leachate from the Llangollen landfill was the most likely source of the contamination. (*Id.* at 66.) The letter further stressed that the *"matter of contamination of an underground aquifer by a landfill is a most serious one."* (*Id.*) (Emphasis in original.) DNREC required the County to take four remedial actions, such as digging test wells and constructing a ditch around the landfill to intercept the leachate. (*Id.*)

The County retained a consultant, Roy F. Weston, Inc., to investigate the landfill and the State's accusations. (D.I. 392A at 802–08, 811.) The County met or corresponded with State officials repeatedly concerning the alleged contamination. A County employee's memo to the file after a meeting with State officials on June 12, 1972, reported that the water sampling done on the Reni well showed that the landfill was the probable cause. (D.I. 109B at 130, 131.) The County realized as early as May 25, 1972, that the cost of resolving the groundwater problems created by Llangollen landfill could easily run over $1,000,000. (*Id.* at 125–26.)

In September, 1972, the County's consultant informed the County that the Llangollen landfill was in fact a source of the Reni well contamination. (D.I. 392B at 1299–1300.) The County then began to work with its consultant to resolve the leachate contamination problem. Wells were constructed to monitor the situation and pump pollutants from the aquifer. (D.I. 392B at 1178; 339A at 74, 81; 392A at 825.) One County official reported that the landfill was regraded and a basin was installed to collect rainwater. (D.I. 392B at 1451–53.) A trench was dug and a large pipe inserted to drain off the water that collected. (*Id.*) The County met from time to time with the State and two neighboring companies, Artesian Water Company and Amoco, to discuss the situation. (D.I. 392A at 823–24; 392B at 1201, 1206.) However, the State on at least three occasions voiced its con-

cern that the County was not making a sufficient effort to remedy the contamination problem. (D.I. 339A at 74–78.) Ultimately, the Artesian Water Company filed two lawsuits against the County as a result of alleged groundwater contamination. In a state court action, *Artesian Water Co. v. New Castle County*, C.A. No. 5106 (Del. Ch.Ct. filed June 9, 1976) ("Artesian I"), Artesian alleged that leachate from the Llangollen landfill had contaminated the aquifer that Artesian used to supply drinking water for a large part of New Castle County. (D.I. 109A at 173–77.) Artesian also filed an action in federal court seeking reimbursement under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, for costs incurred by Artesian in responding to the release of hazardous substances from Llangollen. *Artesian Water Co. v. New Castle Co.*, C.A. No. 83–854 (D.Del. filed Dec. 8, 1983) ("Artesian II"). (D.I. 109A at 273–81.)

### B. *Tybouts Corner Landfill*

When Llangollen reached capacity in late 1968, the County rented land for a new landfill at Tybouts Corner. (D.I. 233A at 147.) The Tybouts Corner landfill opened in January, 1969. The County rented the property from Mr. and Mrs. Ward, who also operated the landfill. (*Id.*) However, there is evidence that County employees worked at the Tybouts Corner landfill and that the County's contract with the Wards for the operation of the landfill gave the County ultimate authority over several areas of the site's operations. (D.I. 233A at 147–63, 523; 339A at 105–111.)

The chief question concerning the operation of Tybouts Corner is whether chemical wastes were accepted. The State Certificate of Approval for the landfill prohibited the dumping of chemical and/or toxic materials. (D.I. 339A at 89–91.) There is substantial dispute as to the degree to which the County complied with this regulation. (D.I. 392 at 17–18; 339 at 13–15.) While the County offers evidence showing that it made every effort to comply, the insurers point to significant memoranda by the United States Environmental Agency indicating that the County repeatedly ignored the reg-

ulation. (D.I. 392B at 1125; 233B at 523; 339A at 105–113.) The Tybouts Corner landfill closed in July, 1971. (D.I. 392 at 17.)

Beginning in August, 1969, the University of Delaware performed a series of water quality investigations at the Tybouts Corner site for New Castle County. (D.I. 339A at 119–58.) The studies clearly show some deterioration of the groundwater due to the seepage of leachate towards the end of the operation of the landfill. (*Id.* at 157.) However, there is a dispute over how serious the problem was. For instance, a December 29, 1970, report stated that while there was evidence of water quality deterioration, the concentrations of contaminants were still "far below the levels that normally constitute pollution." (*Id.* at 154.) One of the last letters from the University of Delaware to the County, dated August 6, 1971, noted that the problem at Tybouts Corner "did not appear to be under control," but found that the County's actions would "keep the situation from worsening" and that "seepage from the landfill seem[ed] to have lessened markedly." (*Id.* at 158.)

In September, 1973, the County accepted a proposal by E.H. Richardson Associates, Inc., to drill wells at the Tybouts Corner site and monitor the water quality. (D.I. 392A at 843–46.) While INA asserts that in 1974 Richardson uncovered a "future significant groundwater problem" (D.I. 339 at 16), INA clearly misquotes from Richardson's report. (D.I. 339A at 167.) Richardson's reports in 1974 did indicate, however, the potential for a groundwater problem in the future. (*Id.*) By at least September, 1976, Richardson concluded that the potential for a groundwater problem had been transformed into a reality. (*Id.* at 159–60.) Richardson's September, 1976 report stated that the data trends indicated that the landfill site was "in the early stages of a leachate problem." (*Id.* at 160.)

In May, 1976, DNREC informed the County that the well of Mrs. Wagner, a neighbor of Tybouts Corner landfill, was contaminated. (D.I. 392A at 959.) DNREC stated that the data indicated that

the landfill was the probable source of the contaminants. (*Id.*) The County denied that the evidence linked the landfill to the contamination of Wagner's well, and continues to deny this allegation. (D.I. 392 at 36, 37.) In 1980, the United States filed an action against the County seeking response costs and injunctive relief for the cleanup of the Tybouts Corner landfill, which the EPA had added to its Superfund list. *United States of America v. New Castle County*, C.A. No. 80–489 (D.Del. filed October 8, 1980). Mrs. Wagner also brought suit against the County in 1982. *Wagner v. New Castle County*, C.A. No. 7008 (Del. Ch.Ct. filed Nov. 10, 1982). Residents living near the Tybouts Corner landfill also filed a class action against the County in 1984. *Andrews v. New Castle County*, C.A. No. 84–124 (D.Del. filed March 2, 1984).

## III. ANALYSIS

### A. *Aetna's Motion*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for summary judgment. Summary judgment is proper under Rule 56(c) if the record on file, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has interpreted Rule 56(c) to require summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (1986).

### 1. Misrepresentation

Aetna argues that summary judgment is appropriate on three grounds: misrepre-

sentation, occurrence, and notice. (D.I. 110; D.I. 336.) Under its misrepresentation argument, Aetna asserts that as to an insurance contract an insured is required as a matter of fair dealing to disclose conditions affecting the risk insured. (D.I. 109 at 31.) Aetna contends that failure to disclose conditions affecting the risk makes an insurance policy voidable at the insurer's option. (*Id.*) Aetna argues that this common law standard was codified in 18 *Del.C.* § 2711. Under § 2711, "in any application for an insurance policy ... [m]isrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either: (1) Fraudulent; or (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or (3) The insurer in good faith would ... not have issued the policy...."[4]

The County's policy with Aetna became effective August 1, 1972. (D.I. 109A at 1.) Aetna contends that the County's failure to disclose the May, 1972 DNREC letter relating to the Llangollen landfill was an omission or concealment. (D.I. 109 at 31–33.) Aetna contends that the DNREC demand letter was clearly material and refers to the affidavit of its underwriter which stated that if Aetna had known about the DNREC letter, it would not have issued insurance to the County. (*Id.* at 33; D.I. 109A at 35–36.)

New Castle County offers several grounds for defense to Aetna's misrepresentation argument. The County asserts that Aetna failed to make an inquiry that would have elicited information regarding the DNREC letter, and that such an inquiry is a condition precedent to a charge of misrepresentation. (D.I. 233 at 70.)

---

**4.** 18 *Del.C.* § 2711 states in full:

**Representations in applications.**

All statements and descriptions in any application for an insurance policy or annuity contract by or in behalf of the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

The County also argues that Aetna has failed to show that the County made a misrepresentation and that the misrepresentation was deliberate, intentional or made in bad faith. (*Id.* at 69.) The County further argues that information regarding the DNREC letter regarding the Llangollen landfill was not material. (*Id.* at 72–74.) The County also argues that 18 *Del.C.* § 2711 is inapplicable because the provision applies only to written applications for insurance; the County insists that it never completed such an application. (*Id.* at 68–69.)

The County has filed a cross-motion for partial summary judgment on the issue of misrepresentation. (D.I. 232.) Even assuming that a misrepresentation was made, the County contends that Aetna had a duty to make inquiries reasonably designed to elicit all relevant information. (D.I. 233 at 75.) Because of Aetna's alleged failure to inquire about the County's landfill activity or to have the County fill out an application for insurance, the County argues that Aetna has waived its right to deny coverage on the basis of a misrepresentation by the County. (*Id.*)

Insurance policies traditionally have been considered contracts requiring the utmost good faith. *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928); *Rust v. Metropolitan Life Ins. Co.*, 175 A. 198 (Del.Super. 1934); 12A John Appleman and Jean Appleman, *Insurance Law and Practice* § 7271 (1981). As the Supreme Court has stated, "failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." *Stipcich*, 277 U.S. at 316; *see also Rust*, 175 A. at 198–99. The Court went on to note, however, that the rule has been relaxed as more insurers require their customers to fill out an application, since the prospective insured may assume that information not requested on the application is immaterial. *Stipcich*, 277 U.S. at 316, 48 S.Ct. at 513.

The facts in this case are somewhat unique in that it does not appear that an application for insurance was filled out by the County, nor did Aetna request that such an application be filled out. The lack of an application distinguishes this case from other Delaware cases involving misrepresentations or omissions. *See Prudential Ins. Co. v. Gutowski*, 113 A.2d 579 (Del.1955); *Prudential Ins. Co. v. Ford*, 144 A.2d 234 (Del.Ch.Ct.1958); *Rust*, 175 A. 198. Courts have held that where the insurer fails to make a proper inquiry as to the material facts at issue, the applicant's failure to disclose those facts will make the contract voidable only if the nondisclosure was fraudulent. *National Aviation Underwriters, Inc. v. Fischer*, 386 F.2d 582, 584 (8th Cir.1967); *Cora Pub, Inc. v. Continental Casualty Co.*, 619 F.2d 482 (5th Cir.), *reh'g denied*, 629 F.2d 1349, 1350 (1980); *American Eagle Fire Insurance Co. v. Peoples Compress Co.*, 156 F.2d 663, 667 (10th Cir.1946); *First State Bank v. New Amsterdam Casualty Co.*, 83 F.2d 992, 994 (5th Cir.1936); *Wharton v. Aetna Life Ins. Co.*, 48 F.2d 37 (8th Cir.), *cert. denied*, 284 U.S. 621, 52 S.Ct. 9, 76 L.Ed. 529 (1931); *Preferred Risk Mutual Insurance Co. v. Hites*, 125 Ill.App.2d 144, 259 N.E.2d 815, 819 (1970).

 There is a factual dispute as to whether Aetna made an inquiry to the County or its agent sufficient to elicit information regarding the DNREC letter. Given the size of the potential liability indicated by the DNREC letter, Aetna's inquiry need not have been precise and meticulous to reveal it. However, there is a dispute as to whether Aetna made even minimal inquiries to the County. The County's loss history was compiled and sent to Aetna by Crum and Forster, an organization unaffiliated with the County. (D.I. 109A at 61; D.I. 233B at 558.) Negotiations for the insurance appear to have been conducted between an insurance agency named J.A. Montgomery and Aetna. There is evidence that Aetna's underwriter was assured that "there have been no major liab[ility] losses on the County's account." (D.I. 109A at 33, 41.) However, it is unclear who made the assurance or when it was made. The County contends that it was not bound by the submissions of J.A. Montgomery because Montgomery was the agent of Aetna and not the County. (D.I. 426 at 80–81.) While there is evidence that

Montgomery was an agent of Aetna (D.I. 417A at 1457–62), there is also evidence that Montgomery was the agent of the County. (D.I. 419A at 580–605.) Under Delaware law, an insurance broker may represent either the insured or the insurer, or both. *Allstate Auto Leasing Co. v. Caldwell*, 394 A.2d 748, 750 (Del.Super.Ct. 1978). The issue is one of fact to be determined from the circumstances surrounding the transaction or course of dealing in question. *Id.* On a motion for summary judgment it is not appropriate for a court to weigh evidence concerning a factual dispute. The question of whether Montgomery was the County's agent is material to showing that Aetna made an adequate inquiry into the County's loss history. Absent such an inquiry, Aetna must show that the County's nondisclosure of the DNREC letter was fraudulent as a matter of undisputed fact. Aetna has failed to make this showing. Therefore, as there is an issue of material fact in dispute, the Court cannot grant Aetna's summary judgment motion on the grounds of common law misrepresentation.

■ The Court also must reject Aetna's statutory argument on the issue of misrepresentation. The Court agrees with the County's assertion that 18 *Del.C.* § 2711 applies only to a written application. As there is an absence of holdings by the Supreme Court of Delaware on this issue, this Court must attempt to predict how the Supreme Court of Delaware would rule. *McGowan v. University of Scranton*, 759 F.2d 287, 291 (3d Cir.1985). Provisions in a statute should be read in light of other parts of the same statute. *Coastal Barge Corp. v. Coastal Zone Industrial Control Board*, 492 A.2d 1242, 1245 (Del.1985). Section 2710 requires that applications for life or health insurance must have been attached to the policy or contract issued in order to be admissible in evidence. The provision clearly is referring to a written application. Given that there is little other evidence offered by the parties indicating precisely what the word "application" was

intended to mean, the Court holds that the word refers to *written* applications for insurance. Aetna further argues that a letter allegedly sent by J.A. Montgomery to Aetna requesting that Aetna consider insuring the County, and enclosing information about the County's exposures and loss history, constitutes an application under § 2711. (D.I. 419 at 5–6.) However, the Court declines to read § 2711 so broadly. As there is no other evidence of the County submitting a written application, § 2711 does not apply to the facts of this case. In conclusion, since there is a dispute as to a material fact under Aetna's common law argument for misrepresentation, and since the Court finds that 18 *Del.C.* § 2711 is inapplicable to this case, the Court will deny Aetna's motion for summary judgment on the grounds of misrepresentation.

■ The Court will also deny New Castle County's crossmotion for summary judgment on the issue of misrepresentation. The County argues that Aetna failed to properly investigate the County and therefore has waived its right to assert that the County made misrepresentations. (D.I. 233 at 75–79.) The County contends that Aetna waived its rights to allege a misrepresentation by failing to have the County fill out an application. (*Id.* at 75.) The County argues that since Aetna allegedly knew about the County's Pigeon Point landfill,[5] a thorough investigation would have inquired about other landfill activities. While a few courts have ruled that insurers have a duty to inquire into the material facts concerning the risk, as noted above the vast majority of courts have held that failure to make a proper inquiry simply makes it more difficult to prove a misrepresentation. *See National Aviation*, 386 F.2d at 584; *Cora Pub*, 619 F.2d at 482; *American Eagle*, 156 F.2d at 663. *But see Government Employees Ins. Co. v. Cain*, 226 F.Supp. 589, 592 (D.Md.1964). As this Court has adopted the latter rule, it holds that failure to make a proper inquiry into the facts surrounding the risk does not

**5.** The County's operation of a landfill at Pigeon Point was separate from its operation of the two landfills involved in this case, Llangollen and Tybouts Corner. The lawsuits underlying this case make claims only as to the County's actions at Llangollen and Tybouts Corner, and they do not make any claims or allegations with respect to the Pigeon Point landfill.

constitute a waiver. The County further argues that when Aetna converted the County's policy from a retrospective policy to a fixed premium policy in July, 1973, the underwriter ignored proper company procedures by not inspecting the County's landfills for pollutants. (*Id.* at 78.) Such conduct by the underwriter hardly constitutes the type of intentional and knowledgeable relinquishment of a known right as Delaware law requires for a waiver. *See Nathan Miller, Inc. v. Northern Ins. Co.*, 39 A.2d 23, 25 (Del.Super.1944). The Court will deny New Castle County's cross-motion for summary judgment on the misrepresentation issue.

### 2. Occurrence

Aetna argues as a second ground for summary judgment that the pollution at the Llangollen landfill was known to the County prior to the effective date of its policy, and therefore the pollution does not constitute an occurrence under the policy. The County's policy with Aetna only provided coverage for damages caused by an "occurrence." (D.I. 109A at 1.) An occurrence is defined by the policy as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (*Id.* at 2.) Aetna contends that because the County knew about the Llangollen contamination, the resulting damage was expected and therefore was not an occurrence covered by the policy. (D.I. 419 at 15.) The County responds that under *Farmer In The Dell Enterprises v. Farmers Mut. Ins.*, 514 A.2d 1097 (Del.1986), only damages caused by intentional acts fail to qualify as "occurrences." (D.I. 392 at 38.) The County asserts that because it did not intend to pollute the groundwater at the Llangollen landfill, coverage cannot be avoided under the occurrence provision.

*Farmer In The Dell* examined the occurrence provision in light of a very different set of facts. That case involved a restaurant destroyed by fire. The insured's son had set a trash fire close to the building. He clearly intended to start the fire, but did not intend to burn down the restaurant.

*Farmer In The Dell*, 514 A.2d at 1098. The court held that the exclusion should be applied when there is an intentional act along with an intent to cause damage, as long as the damage which actually occurred was reasonably foreseeable. *Id.* at 1099. The court in *Farmer In The Dell* appears to have only been interpreting the occurrence definition as it applied to intended damages. The opinion did not state that damages that are expected, but not intended, should still receive coverage; indeed, such a ruling would appear to be contrary to the plain meaning of the occurrence provision. The court seemed to acknowledge that the "expected nor intended" language creates two distinct grounds for exclusion when the court concluded that "[w]here the tortfeasor clearly lacks the intent to inflict any damage or injury, and it is not foreseeable that damage will occur, the exclusion will not apply." *Id.* at 1100.

■ The case at issue, where the insured had evidence of a probable loss before the policy period began, more closely resembles *Summers v. Harris*, 573 F.2d 869 (5th Cir. 1978). In *Summers* the Fifth Circuit held that an insurer need not provide coverage under a flood insurance policy for damages from a flood which began before the policy was issued. *Id.* at 872. Though the flood waters had not yet reached the insured's house when the policy was issued, and therefore the insured did not know for certain that the loss would occur, the court stressed that the flood was one continuous process that had begun prior to the policy. *Id.* Similarly, in the case at bar, the loss may not have been a certainty when the policy was issued. However, the process causing the loss began before the policy was issued, and the County received strong indications that a loss would occur. The holding in *Summers* was adopted by the Third Circuit in *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir.1982). Applying general principles of insurance law, the court denied coverage because "the risk of liability was no longer unknown." *Id.* at 63. This general rule has been adopted by several courts. *See Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir.1981); *Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496 (5th

Cir.1976); *Presley v. National Flood Insurers Assoc.*, 399 F.Supp. 1242 (E.D.Mo. 1975). Other courts have adopted a similar rule that where there is evidence beforehand indicating a substantial probability that a loss will occur, if the loss does occur, it is not an occurrence. *See City of Carter Lake v. Aetna Cas. & Sur.*, 604 F.2d 1052, 1059 (8th Cir.1979); *Honeycomb Systems Inc. v. Admiral Ins. Co.*, 567 F.Supp. 1400, 1405 (D.Me.1983). In this case, it is undisputed that the process of groundwater contamination from Llangollen landfill was already in progress as of August 1, 1972, the effective date of Aetna's policy. As noted above, the State's tests indicated that the County was "the most likely source of contamination." (D.I. 109B at 123.) After further tests and meetings with State officials, a County employee concluded that "the landfill [was] the probable cause" of the groundwater contamination. (D.I. 109B at 130.) This evidence indicates that the County knew before August 1, 1972, that there was a substantial probability that the Llangollen landfill was responsible for the groundwater contamination at issue here. Under these facts, this Court holds as a matter of law that the damages resulting from Llangollen landfill leachate were expected and therefore were not occurrences. The Court will grant a partial summary judgment to Aetna on all claims arising from the Llangollen landfill.

### 3. Notice

■ The final basis for summary judgment asserted by Aetna is that the County failed to give proper notice to Aetna of the

occurrences and of the resulting claims. The County's policy required as a condition to coverage that notice of occurrences and claims be given as soon as practicable.[6] (D.I. 109A at 2.) New Castle County concedes that it did not give timely notice to Aetna as to any of the relevant claims. However, under Delaware law, in order to avoid coverage insurers must prove that actual prejudice resulted from the delay in notification. *State Farm Mut. Ins. v. Johnson*, 320 A.2d 345, 347 (Del.1974); *Falcon Steel Co. v. Maryland Cas. Co.*, 366 A.2d 512, 513 (Del.Super.1976). Aetna contends that in this case, where the delay in notification was allegedly two and a half years or more for the claims and nearly eight years for the underlying occurrence (the pollution from Tybouts Corner landfill), prejudice should be presumed. (D.I. 337 at 21–22.) However, the court in *Falcon Steel* clearly rejected the notion that prejudice may be presumed from long delays. *Falcon Steel*, 366 A.2d at 518. Because Aetna has failed to show by undisputed evidence that it has suffered prejudice due to the County's failure to give timely notice of any claims and the occurrence, this Court will deny Aetna's motion for summary judgment on the issue of notice.[7]

### B. *INA's Motion*
#### 1. Occurrence

■ New Castle County alleges that it received from INA three one-year primary general liability policies and one three-year excess policy covering the period from April 15, 1966 to April 15, 1969.[8] (D.I. 339

---

6. The relevant section of the policy reads:
 CONDITIONS
 4. Insured's Duties in the Event of Occurrence, 'Claim or Suit
 (a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.... (b) If a claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

7. In its reply brief Aetna asserted that it had suffered actual prejudice and gave three examples. This argument was not made in Aetna's opening brief. Under Rule 3.2(D)(2) of the Local Rules of Civil Practice, a party "shall not reserve material for the reply brief which should have been included in a full and fair opening brief." Accordingly, the Court will disregard Aetna's untimely argument on the question of actual prejudice.

8. Neither the County nor INA has been able to locate the primary policies for April 15, 1966 to April 15, 1968. Documentation on the excess policy is also allegedly incomplete. However, the issue of the existence of these policies is not before the Court at this time.

at 17.) INA seeks summary judgment on three grounds: (a) that there was no occurrence, (b) that the County failed to prevent further harm, and (c) that the County failed to provide timely notice. (D.I. 339 at 3, 4.) Under its occurrence argument, INA argues that an insured should be deemed to expect all reasonably foreseeable consequences of its acts. (*Id.* at 20, 21.) INA asserts that the County's practices in operating the two landfills made it foreseeable that leachate from the landfills would contaminate the groundwater. At Llangollen landfill, INA contends that the dumping of trash into standing pools of water, the excavation of part of the clay layer, and the failure to apply adequate cover made the leachate problem foreseeable. (*Id.* at 23.) INA argues that the receiving and dumping of chemical waste at Tybouts Corner landfill made groundwater contamination foreseeable there as well. (*Id.* at 24.)

The case law holds that the word "expected" in the occurrence definition implies more than reasonable foreseeability; it requires that there be a substantial probability that a given event will occur. *City of Carter Lake,* 604 F.2d at 1057; *Honeycomb Systems,* 567 F.Supp. at 1405. The facts required to meet this standard are all disputed by the County. The County asserts that the operators of Llangollen landfill and not the County were responsible for any dumping of trash into standing water and any excavation of the landfill's clay liner. (D.I. 392 at 42, 44.) The County contends that it was not aware that dumping trash into standing water would cause groundwater contamination. (*Id.* at 42.) In addition, the County argues that the leachate would not have infiltrated down to the groundwater had it not been for increased removal of water from the aquifer by Artesian and Amoco. (*Id.* at 44.) The County denies INA's allegation that proper guidelines were not enforced with regard to the dumping of chemical wastes at Tybouts Corner. It is also asserted by the County that Tybouts Corner was designed so that any leachate escaping from the landfill would be renovated naturally by the soil before reaching the groundwater. (*Id.* at 47.)

While there is certainly evidence to support some of INA's allegations, particularly with regard to lax enforcement of chemical dumping guidelines at Tybouts Corner, this Court finds on the whole that there are material facts in dispute. Consequently, the Court will deny INA's motion for summary judgment on the basis of the occurrence issue.

### 2. Mitigation

The County's policy with INA provided that in the event of an occurrence the County was obligated to take steps to prevent further damages. (D.I. 339A at 188.) The cost of such preventive measures was not recoverable under the policy. (*Id.*) INA's first argument under this provision is that most of the claims underlying this action are in reality attempts to force the County to take preventive measures. (D.I. 339 at 29.) INA asserts that the May 18, 1972 DNREC letter, the two suits brought by Artesian, the suit by the EPA, and parts of the *Wagner* and *Andrews* suits do not involve actual damages but instead seek to prevent further contamination.

The County responds by contending that the underlying claims simply seek to repair what has already occurred. (D.I. 392 at 55–56.) Though there appears to be a paucity of cases on this question, the County cites to *Chemical Applications Co. v. Home Indemnity Co.,* 425 F.Supp. 777 (D.Mass.1977). The court in *Chemical Applications* held that a mitigation clause identical to the one at issue here required the insurer to pay for the cleanup of an oil spill. 425 F.Supp. at 778. However, the court in *Chemical Applications* did note that under the mitigation provision the insured, at its expense, would normally be required to correct any fault necessary to prevent further injury. *Id.* Though the decision in *Chemical Applications* is clearly not binding, this Court agrees with the *Chemical Applications* interpretation of the mitigation provision. In the case at bar, the Court finds that the underlying claims essentially seek three remedies: (1) compensation for injury suffered by the respective plaintiffs; (2) injunctive relief forcing the County to cleanup the contami-

**1332**

nants released by the landfill, or compensation for costs expended by the plaintiffs to do the same; and/or (3) injunctive relief forcing the County to take the actions necessary to prevent the further release of contaminants from the landfill, or compensation for the costs incurred by the plaintiff in doing the same. The Court holds that INA is liable for the first two categories of costs, but not the third, the last category being essentially the costs required to remedy those "faults" in the landfills which lead to the release of contaminants.

Considering the specifics of each claim, the Court finds that substantial parts of the relief measures sought in the underlying actions are in fact mitigation measures. The Court finds that three of the measures demanded by the State in the DNREC letter are intended to prevent the release of more contaminants. These three measures are: (1) covering and grading of the landfill; (2) digging a drainage ditch around the landfill; and (3) treatment of leachate prior to its discharge into Army Creek. (D.I. 109B at 123.) As to the fourth measure, the insertion of test wells near the landfill, further evidence is required to ascertain the purpose of this measure. (*Id.*) In *Artesian I*, plaintiff's claim is somewhat vague but appears to seek an injunction forcing the County to cleanup the leachate that has already escaped from the landfill, as well as remedying the conditions which continue to release the leachate. (*Id.* at 173–80.) INA will only be liable for the former costs.[9] In *Artesian II*, plaintiff seeks only reimbursement for costs it incurred in responding to the leachate contamination, along with damages. (*Id.* at 273–81.) INA is liable for all of these costs. In *United States v. New Castle County*, the EPA seeks injunctive relief and reimbursement for costs for both the removal of escaped contaminants and for cleanup of the landfill to prevent the future escape of contaminants. (*Id.* at 282–99.) INA is liable only for the first category of costs. The plaintiffs in *Wagner* and *An-*

*drews* seek damages, cleanup of the released leachate, and the remedial efforts necessary to prevent the future escape of leachate from the Tybouts Corner landfill. This Court holds that INA is liable only for the alleged damages and the cleanup of released contaminants. In sum, the Court will issue a partial summary judgment in favor of INA and denying coverage to the County for those parts of the underlying lawsuits requesting measures designed to cleanup the landfills and prevent further leachate release, as outlined above.

■ INA's second argument under the mitigation clause is that the County failed to take the preventive measures necessary to prevent further injury, as required by the policy's mitigation clause. (D.I. 339 at 32–36.) As to the Llangollen landfill, INA's argument is insufficient because it fails to allege exactly what further injury occurred due to the County's lack of mitigation. Regarding Tybouts Corner, INA contends that the County was warned about pollution at Tybouts in the early 1970s. (D.I. 418 at 15.) INA argues that if the County had taken the proper preventive measures when it learned of the contamination, it would have prevented the injuries which led to the *Wagner* and *Andrews* suits. (*Id.*) The County concedes that no preventive measures were taken at Tybouts Corner landfill. (D.I. 392 at 57.) However, the County disputes that preventive measures, taken after the County discovered the contamination of the groundwater, would have prevented injury to the plaintiffs in *Wagner* and *Andrews*. (*Id.*) As there are clearly material facts in dispute on this issue, the Court will deny INA's motion for summary judgment on the grounds of the County's failure to take preventive measures.

### 3. Notice

INA's last argument is that there is no coverage for the underlying claims because of the County's failure to give proper notice. The notice provision in INA's policy

**9.** Artesian also sought damages in *Artesian I,* however, the Delaware Court of Chancery has ruled that Artesian is precluded from recovering damages from the County in that litigation be-

cause of sovereign immunity. *Artesian Water Co. v. New Castle County,* C.A. No. 5106 (Del. Ch.Ct. August 4, 1983).

is identical to Aetna's provision set out above. *See supra* at 1330, n. 6. Because the County concedes that it did not give timely notice to INA, the only remaining issue is whether INA has suffered actual prejudice due to the County's delay in notice.

INA contends that it has been prejudiced first by changes in relevant physical evidence. (D.I. 339 at 43.) The insurer asserts that the surface characteristics of the landfill can change in three to six months. (D.I. 418 at 19.) In addition, INA argues that the chemical content of the leachate plume can change in as short a time as six months. (*Id.*) INA contends that this case resembles *Colonial Gas Energy System v. Unigard Mut. Ins. Co.*, 441 F.Supp. 765 (N.D.Cal.1977). The court in *Colonial Gas* found that the insurer was prejudiced due to delayed notice where the insured sought coverage for a faulty tank. The insured made repairs on the tank's interior and then resealed the tank, denying the insurer access to investigate the problem. 441 F.Supp. at 770. Second, INA charges that it has lost valuable witness testimony, in particular due to the deaths of George Dutcher and John Cahalan. (*Id.* at 22–23.) Dutcher was the Director of the County's Department of Public Works, and Cahalan was a County Engineer during periods relevant to this litigation.

The County argues that the physical evidence in question regarding the landfills is available through the various studies performed on the landfills. (D.I. 392 at 62–63.) The County asserts that INA made no effort to investigate the landfills even when INA did receive notice of the claims. The loss of Dutcher and Cahalan does not prejudice INA, according to the County, because there are many other people who were associated with the landfills and who can provide the same information. The County criticizes the declaration of INA Assistant Vice–President Barkman, which stated that INA suffered prejudice for the reasons discussed above. (D.I. 392 at 61–64.) The County charges that Barkman's statements were overly general and that Barkman had insufficient knowledge of the substantial volume of evidence on record in this litigation.

The Court finds that there are disputed issues of material fact as to whether INA has suffered actual prejudice due to the delay in notice. For instance, with regard to the physical evidence of the landfills, the Court notes that in an EPA report cited by INA, an EPA engineer concluded that surface evidence pertaining to the operation of the Llangollen landfill was "obliterated" when the final cover of sand and gravel was applied to the landfill in 1968. (D.I. 339A at 16.) Because it is questionable whether Barkman adequately reviewed all the relevant evidence, the Court is unable to conclude that INA could not acquire the relevant data regarding the chemical content of the leachate from the various studies performed by consultants, state officials, and EPA officials. The loss of witness testimony presents a more difficult issue. However, INA has failed to make a sufficient showing that, as a matter of undisputed fact, Dutcher and Cahalan possessed knowledge which is unavailable from any other person. In sum, this Court concludes that this case is distinguishable from *Colonial Gas*, where the insurer had very limited access to information once the tank was sealed. In this much more complicated litigation, where three dozen depositions have been taken and volumes of relevant studies, memoranda, correspondence and reports have been compiled, this Court cannot conclude that the information in question that was allegedly lost cannot be recovered from an alternate source. Consequently, as there are material issues of fact in dispute, this Court will deny INA's motion for summary judgment on the issue of notice.

### C. *U.S. Fire's Motion*

U.S. Fire issued primary and excess insurance policies to the County for the period from April 15, 1969 to August 1, 1972. (D.I. 341 at 2.) The insurer argues for summary judgment on three grounds: occurrence, notice and mitigation. (*Id.* at 1.) In support of its argument, U.S. Fire adopts the arguments put forth by INA. (*Id.* at 5.) Since the language regarding the above three provisions in U.S. Fire's policy is identical to that of INA's policy, this Court will deny U.S. Fire's motion on

the issue of the occurrence and notice provisions. However, the Court will grant a partial summary judgment in favor of U.S. Fire on the issue of coverage for mitigation costs. Like INA, U.S. Fire will not be obligated to provide coverage to the County for costs resulting from efforts to clean-up the two landfills sufficiently to prevent the future release of contaminants.

### D. *CNA's Motion*
#### 1. Occurrence

■ CNA has filed for summary judgment on two grounds, the occurrence argument and the untimely notice argument. (D.I. 228 at 3–4.) Under the occurrence argument, the County concedes that there was discovery of the problem at Llangollen landfill in September, 1972, prior to the issuance of CNA's policy. (D.I. 392 at 51–52.) The County therefore acknowledges that CNA is not liable for claims originating from the LLangollen landfill. (*Id.* at 52.)

CNA issued insurance policies to the County covering the period from April 15, 1973 to July 1, 1975. (D.I. 228 at 1.) The wording of CNA's policies is identical to Aetna's and INA's with regard to the occurrence and notice provisions. (D.I. 228 at 4–5.) CNA argues that the County was informed of the leaching of contaminants at Tybouts Corner as early as 1969. (*Id.* at 14.) The insurer contends that consequently there was no occurrence because the contamination was expected. (*Id.*) However, the County asserts that the early reports of leaching showed only a slight amount of contaminants, substantially below the level that would indicate pollution. (D.I. 392 at 19, 52–53.) Evidence cited by the County appears to indicate that a groundwater problem at Tybouts Corner was not discovered until the middle of 1976. (D.I. 339A at 159–63; D.I. 392A at 959.)

■ CNA argues alternatively that none of the events that would trigger coverage by the insurer occurred during the period when CNA's policies were in effect. (D.I. 228 at 18.) CNA argues that under *Riehl v. Travelers Ins. Co.,* 772 F.2d 19 (3d Cir.1985), the three possible triggering events in a case of this nature are: when dumping first began, when leaching first commenced, or when the pollution was first discovered. The insurer contends that none of these three events occurred during CNA's policy period, and therefore CNA cannot be held liable. The Court finds that under this argument, just as under the insurer's first argument, there are material facts in dispute. It has not been established conclusively when the leaching from Tybouts Corner landfill became substantial enough to constitute pollution. Consequently, this Court will deny CNA's motion for summary judgment as to claims arising from the Tybouts Corner landfill, but will grant to CNA a partial summary judgment for all claims arising from the Llangollen landfill.

#### 2. Notice

■ The other ground for summary judgment asserted by CNA is that the County failed to give timely notice as required by the CNA policies. (D.I. 228 at 29–30.) CNA argues that it should not be required to show prejudice in this case because of the long delay of notice. (D.I. 421 at 6–7.) However, as the Court noted above, the Delaware Superior Court's opinion in *Falcon Steel* clearly rejected the position that prejudice may be presumed. 366 A.2d at 518. In the absence of an authoritative pronouncement on this issue by the Delaware Supreme Court, this Court will accept the Superior Court's interpretation in *Falcon Steel.* Because CNA has failed to show that it has suffered any prejudice from the County's delayed notice, this Court will deny CNA's motion for summary judgment on the grounds of untimely notice.

### IV. CONCLUSION

Regarding Aetna's motion for summary judgment on the grounds of misrepresentation, the Court finds there is an issue of material fact in dispute. Consequently, Aetna's motion for summary judgment on the issue of misrepresentation must be denied. The Court will also deny the County's motion for partial summary judgment on the issue of whether Aetna waived its right to assert the misrepresentation issue. However, the Court will grant Aetna a

partial summary judgment on the occurrence issue for all claims emanating from Llangollen landfill. The Court finds that the evidence establishes that the County knew there was a substantial probability that the Llangollen landfill was responsible for groundwater contamination. Therefore, claims arising from Llangollen landfill were expected and do not meet the definition of an occurrence under Aetna's policy. On the issue of untimely notice, the Court finds that Aetna has failed to show that it has suffered prejudice. The Court will deny Aetna's motion for summary judgment on the issue of notice.

The Court will deny INA's and U.S. Fire's motions for summary judgment on the occurrence issue because there are material facts in dispute as to whether the County expected the contamination problems at Llangollen and Tybouts Corner. However, the Court will grant a partial summary judgment to INA and U.S. Fire for all the underlying claims which seek injunctive relief or compensation for the cleanup of Llangollen and Tybouts Corner landfills necessary to prevent the future release of contaminants from the landfills. The Court rules that such claims are precluded from coverage by the mitigation clause in the policies issued by INA and U.S. Fire. On the issues of the County's failure to take preventive measures and failure to give timely notice, the Court concludes that there are material facts in dispute and will deny INA's and U.S. Fire's motions for summary judgment on these grounds.

The Court will grant partial summary judgment to CNA for all claims emanating from Llangollen landfill. However, the Court holds that there are issues of material fact in dispute as to CNA's arguments on the occurrence and notice issues. Therefore, the Court will deny summary judgment to CNA on the issues of occurrence and notice.

Judgment will be entered in conformity with this Memorandum Opinion.