NEW CASTLE COUNTY, Plaintiff,

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut corporation; Home Insurance Company, a New Hampshire corporation; New Hampshire Insurance Company, a New Hampshire corporation; Continental Casualty Company, an Illinois corporation; United States Fire Insurance Company, a New York corporation; Insurance Company of North America, a Pennsylvania corporation; Continental Insurance Company, a New Hampshire corporation; United States Liability Insurance Company, a Pennsylvania corporation; National Union Fire Insurance Company, a Pennsylvania corporation; Twin City Fire Insurance Company, a Minnesota corporation; Aetna Casualty and Surety Company, a Connecticut corporation; and Zurich Insurance Company, a Swiss corporation, Defendants.

Civ. A. No. 85–436–JLL.

United States District Court,
D. Delaware.

Oct. 31, 1991.

As Amended Nov. 21, 1991.

George H. Seitz of Prickett, Jones, Elliot, Kristol & Schnee, Wilmington, Del., and Joseph D. Tydings, Jerold Oshinsky, and Catherine J. Serafin Sponseller of Anderson, Kill, Olick & Oshinsky, Washington, D.C., of counsel, for plaintiff New Castle County.

John G. Mulford and Michael J. Goodrick of Theisen, Lank, Mulford & Goldberg, Wilmington, Del., and Arthur Makadon, David L. Cohen, Geoffrey A. Kahn, Walter Einhorn, Jr., and Gilpin W. Bartels of Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., of counsel, for defendant Continental Cas. Co.

Clifford B. Hendler, John I. Stewart, Jr., Scott L. Winkelman, and William D. Wallace of Crowell & Moring, Washington, D.C., and Dennis M. Flannery and A. Stephen Hut, Jr., of Wilmer, Cutler & Pickering, Washington, D.C., of counsel, for defendant Insurance Co. of North America.

William J. Cattie III of Heckler & Cattie, Wilmington, Del., and Edward B. Deutsch, Laurence M. McHeffey and Loren L. Pierce of McElroy, Deutsch & Mulvaney, Morristown, N.J., of counsel, for defendant U.S. Fire Ins. Co.

Gary W. Aber of Heiman, Aber & Goldlust, Wilmington, Del., and James E. Rocap III, Thomas B. Carr and D. Bradley Clem-ents of Miller, Cassidy, Larroca & Lewin, Washington, D.C., of counsel, for defendant Aetna Cas. & Sur. Co.

Dennis D. Ferri and Michael A. Pedicone of Dennis D. Ferri, P.A., Wilmington, Del., and Philip A. Ryan of German, Gallagher & Murtagh, Philadelphia, Pa., of counsel, for defendant U.S. Liability Ins. Co.

Norman M. Monhait of Rosenthal, Monhait & Gross, Wilmington, Del., and Roger E. Warin, Virginia L. White–Mahaffey, Anita G. Raby and Janet W. Steverson–Wright of Steptoe & Johnson, Washington, D.C., of counsel, for defendant The Home Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

### I. NATURE OF THE ACTION

New Castle County (the "County") originally filed this action against twelve insurance companies which had issued insurance policies to the County. The County sought a declaration that the insurance companies must defend and indemnify the County. The County had incurred liability as a result of pollution from two landfills, Langollen and Tybouts Corner. All of the insurers denied coverage and asserted affirmative defenses, and some of the insurers filed cross-claims against each other. The County settled with eleven of the insurers before trial, leaving only Continental Casualty Company ("CNA") to defend the policy implicated here.[1] *New Castle v. Continental Casualty Co.*, 725 F.Supp. 800, 802–03 (D.Del.1989) (*"New Castle III"*), rev'd sub. nom. *New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162 (3d Cir.1991) (*"New Castle V"*).

The parties in this case have already come before this Court several times and now appear on remand. *See New Castle County v. Hartford Accident & Indemnity Co.*, 673 F.Supp. 1359 (D.Del.1987) (*"New Castle I"*); *New Castle County v. Hartford Accident & Indemnity Co.*, 685 F.Supp. 1321 (D.Del.1988) (*"New Castle*

---

1. The eleven insurance companies that have settled are the following: U.S. Fire Insurance Company, U.S. Liability Insurance Company, Aetna Casualty & Surety Company, Hartford Accident & Indemnity Company, Twin City Fire Insur-ance Company, Home Insurance Company, Insurance Company of North America, National Union Fire Insurance Company, Continental Insurance Company, Zurich Insurance Company, and New Hampshire Insurance Company.

II"); *New Castle III, New Castle County v. Continental Casualty Co.*, 728 F.Supp. 324 (D.Del.1989) ("*New Castle IV*"). In *New Castle I* the Court denied the insurers' motion concerning the scope of the pollution exclusion clauses and the term "damages" under the policies. The Court held that "sudden" discharge or dispersal in the pollution exclusion clause constitutes an "unexpected" discharge or dispersal. *See* 673 F.Supp. at 1364. The Court also held that the term "damages" encompassed liability. *See id.* at 1365–66. Both of these holdings have been upheld on appeal. *See New Castle V*, 933 F.2d at 1184–91, 1193–99. In *New Castle II* the Court granted CNA's motion for summary judgment with regard to claims regarding the Llangollen landfill and denied the motion with regard to the "notice" and "occurrence" issues. *See* 685 F.Supp. 1321.

After a trial without a jury on June 5–8, and 12–14, 1989, this Court made its findings of fact and conclusions of law in *New Castle III*. In determining whether CNA was obligated to afford primary coverage to the County, the Court looked to four criteria distilled from the policy's provisions of coverage and its definition of occurrence. The Court held (1) the beginning of the injurious process of property damage triggered CNA's primary policies; (2) the pollution exclusion clause [2] and the occurrence clause [3] were co-extensive, only "expected" pollution damage would therefore fall outside of the policy under either

2. The pollution exclusion clause bars insurance coverage for

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

*New Castle I*, 673 F.Supp. at 1362 n. 4.

3. An "occurrence" triggers CNA's duty to pay damages. The parties agree that an "occurrence" is

> an accident, including injurious exposure to condition, which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.

clause, and there was neither a "substantial probability" nor an "expectation" of off-site pollution with regard to the Tybouts County Landfill; (3) the Owned Property Exclusion in the policy did not apply; and (4) there was no basis for the proration of losses among all the policies triggered. *New Castle III*, 725 F.Supp. at 809–17. The Court also decided issues not relevant to primary coverage, which is at issue here.[4] The Court denied CNA's motion for reargument.

CNA then filed cross-claims against other insurers that had previously settled with the County and sought a judgment under Rule 54(b) that would allow these cross-claims.[5] This Court held that a stipulation between the insurance companies barred the cross-claims at issue. *New Castle IV*, 728 F.Supp. 324. On appeal, the Third Circuit reversed, finding that the cross-claims were filed in a timely manner, and refused to decide whether the settlements between the County and the other insurance companies barred the cross-claims. *New Castle V*, 933 F.2d at 1203–06.

With regard to the insurance policy's coverage, the Third Circuit upheld the decision in all respects but one: the occurrence clause and the pollution exclusion clause should not be considered co-extensive. *See New Castle V*, 933 F.2d 1162. The Court now takes up the case on remand, setting forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

*New Castle V*, 933 F.2d at 1180–81; *see also New Castle III*, 725 F.Supp. at 807 & n. 8; *New Castle II*, 685 F.Supp. at 1329; *New Castle I*, 673 F.Supp. at 1363 n. 5.

4. Specifically, the Court held (1) with regard to excess coverage, one policy had been triggered, while a second was prematurely brought with respect to the duty to indemnify; (2) no mitigation clauses applied to excess coverage; (3) CNA had a duty to cover the County's defense of three suits; and (4) the County's request for attorney's fees was not warranted. *New Castle III*, 725 F.Supp. at 817–20.

5. The cross-claims were filed against Insurance Company of North America, U.S. Fire Insurance Company, Aetna Casualty & Surety Company, Home Insurance Company, and U.S. Liability Insurance Company. *New Castle IV*, 728 F.Supp. at 326.

## II. THE LAW OF THE CASE AND THE ISSUE BEFORE THE COURT

The first question before the Court is precisely what it is required to decide on remand. First, it is clear that the Third Circuit decided that the pollution exclusion clause and the occurrence clause should not be considered co-extensive. According to the Third Circuit, this Court's reliance on the fact that "the phrases 'neither expected nor intended' and 'sudden and accidental' are roughly synonymous ... was reversible error." *Id.* at 1203. The Third Circuit discusses the issue under the subheading "The Damage/Discharge Distinction," and the analysis focuses on this issue. *Id.* at 1199–1203.

■ Second, as a consequence of its analysis of the damage/discharge distinction, the Third Circuit remanded the case for this Court to determine if the discharge would be excluded from coverage under the pollution exclusion clause. In its final conclusion, the Third Circuit asked the Court to address the following question:

"[t]he district court on remand should determine whether the County expected Tybouts Corner landfill to discharge or release contaminants into or upon the land, or any watercourse or body of water."

*Id.* at 1207. Answering Brief of New Castle County, Docket Item ("D.I.") 576 at 3. In its opinion, however, the Third Circuit has used the term "leachate" interchangeably with the terms "contaminants" and "pollutants." *See id.* at 1202–03. Where the term "leachate" was used, the Third Circuit stated that this Court should determine whether the County expected the Tybouts Corner landfill to discharge or release leachate. *Id.* The opinion uses the same language as in its conclusion, with the exception of the term "leachate." The Court assumes from the opinion that the Third Circuit presumed leachate to be a contaminant or pollutant within the meaning of the pollution exclusion clause. In its Reply Brief, CNA contends that these statements establish the mandate of the Third Circuit and the law of the case. Reply Brief of CNA, D.I. 578 at 4–5. If this Court accepts

it as such, this Court would be bound to follow it. *See Delgrosso v. Spang & Co.,* 903 F.2d 234, 240 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990).

The Court finds that the Third Circuit's occasional equation of leachate with pollutants or contaminants constitutes a presumption of fact not binding on this Court rather than part of the mandate or the law of the case. While the Court must adhere to the clear mandate of a superior court, the Court must also avoid implementing the mandate so as to exceed its scope. *Texas Oil & Gas Corp. v. Hodel,* 654 F.Supp. 319, 323 (D.D.C.1987). The Third Circuit has held that a district court "may consider as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." *Delgrosso,* 903 F.2d at 240 (citation and punctuation omitted); *see also Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979).

The most obvious way to formulate the issue is in terms of whether the County expected to discharge or release contaminants. In its conclusion, the Third Circuit used the word "contaminants," and both parties have initially accepted this formulation as the issue. Opening Brief of CNA, D.I. 573 at 1; Answering Brief of New Castle County, D.I. 576 at 3. This formulation also tracks the language of the pollution exclusion clause, which is the logical way to formulate the issue once the Third Circuit has separated the occurrence clause and the damage clause.

The words and the structure of *New Castle V* also indicate that little weight should be given to the linguistic equation of "leachate" with "pollutants" or "contaminants." Where the Third Circuit did use the term "leachate," it did so without any legal or factual explanation in an opinion that, in other respects, explained its conclusions at great length. The use of the term actually occurs while the Third Circuit explicitly discussed *another* issue—the damage/dispersal distinction. *New Castle V,* 933 F.2d at 1109–1203. In adopting this

Court's definition of leachate, the Third Circuit also demonstrated that it did not consciously define the term so that it must be considered a pollutant or contaminant.[6] Today leachate is commonly understood to be a pollutant, so the equation of terms is understandable where the issue is not squarely presented for determination. This Court cannot read into the mere use of the term "leachate" in the discussion of another issue the conclusion that the Third Circuit explicitly determined that leachate constitutes a "pollutant" or "contaminant" under the contract. *Cf. Delgrosso,* 903 F.2d at 240 ("Our reference to the Lorain plant at the beginning of the opinion was not intended as a definition of the Fund [which one party asserts narrowed the issue on remand]—but rather as a description of the participants who had initiated the suit.").

Nor can the Court conclude that *New Castle V* implicitly decided the question. A question is implicitly disposed of where it was necessarily implied in the claim before the appellate court or if the failure to raise the question constitutes implied waiver. *Kovats v. Rutgers,* 633 F.Supp. 1469, 1472 (D.N.J.1986). The determination of the status of leachate was not necessary to reverse this Court's determination that the occurrence clause and the pollution exclusion clause are co-extensive. Rather, the issue arises as a consequence of the Third Circuit's holding that the occurrence clause and the pollution clause must be considered separately.

■ CNA argues that, because the County did not argue that leachate does not constitute a pollutant or a contaminant under the contract on appeal, it has waived its ability to make this argument. Consequently, the Court could not consider the issue on remand. Indeed, there is authority stating that it is improper to raise new defenses that had not been discussed earlier. *See New York City Unemployed & Welfare Council v. Brezenoff,* 742 F.2d 718, 724 n. 3 (2d Cir.1984). This principle, however, applies to defenses or arguments that are separate from the establishment of the elements of the other party's prima facie case. *See, e.g., id.* (government barred from asserting additional interest to justify speech ban on remand). Here, the question of whether "leachate" can be considered a "pollutant" or "contaminant" under the contract is part of CNA's argument that coverage is excluded under the pollution exclusion clause. *See New Castle V,* 933 F.2d at 1181–82 (CNA has burden of proving application of pollution exclusion clause). The issue involves this Court's examination of the facts at trial to determine whether CNA has proven the application of the pollution exclusion clause, not a separate legal argument on the part of the County.[7] On remand, this Court stands in the position to determine the merits of CNA's argument on the existing factual record. *See Delgrosso,* 903 F.2d at 240.

## III. FINDINGS OF FACT

Previous discussions of the facts in this case appear in *New Castle V,* 933 F.2d at 1169–76; *New Castle III,* 725 F.Supp. at 803–09; *New Castle II,* 685 F.Supp. at 1324–26; and *New Castle I,* 673 F.Supp. at 1361–62. The Court relies on *New Castle III* for its version of the facts, since the Court found these facts after a full trial. The Third Circuit relied on these findings of fact in its own discussion. *New Castle V,* 933 F.2d at 1169. The Court finds that the facts as described in *New Castle III,* 725 F.Supp. at 803–09, are sufficient to decide this issue.

6. "Leachate" has been defined as "[a]n aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, underlying mineral strata, or other materials." *New Castle V,* 933 F.2d at 1167 n. 5; *New Castle III,* 725 F.Supp. at 803 n. 4 (quoting 2 *International Dictionary of Medicine and Biology* 1533 (1986)).

7. A consideration of the mandate of the Third Circuit confirms this view. In addressing the resolution of the question under the pollution exclusion clause, the Third Circuit specifically stated that it did not know what the County would argue in response to its reading of the facts. The County could have argued that it did not intend or expect any discharge of leachate on the previous appeal. Yet CNA does not argue that it has waived this argument, for the mandate of the Third Circuit specifically allowed such a new argument on remand.

### A. The County Expected the Discharge of Leachate from the Tybouts Corner Landfill Into or Upon the Land or Any Watercourse or Body of Water.

The issue before the Court is a factual question "whether the County expected Tybouts Corner landfill to discharge or release contaminants into or upon the land or any watercourse or body of water." *New Castle V,* 933 F.2d at 1207.

The issue presents several questions. First, was there a "discharge or release" of a substance at Tybouts Corner? Second, was this discharge or release "into or upon the land or any watercourse or body of water?" Third, did the County "expect" the discharge or release of the substance? Finally, should the substance be labelled a "contaminant[ ]" under the meaning of the contract? Most of these questions have an apparent answer. In *New Castle III,* this Court found that, when leachate was found in areas around the site, "the landfill was functioning as expected." 725 F.Supp. at 815. The entire design of the landfill reflected an understanding that leachate would filter through the soil into the surrounding land and water. This design can be explained by the fact that it reflected the most sophisticated knowledge of the time. Other evidence suggests that the discharge of leachate was not unexpected. *See New Castle V,* 933 F.2d at 1202–03. The Court need not belabor the point, and the County does not seriously dispute it. The County expected the discharge or release of a substance into or upon the land or any watercourse or body of water. The remaining question is whether leachate constituted a contaminant under the contract.

### B. The Parties Did Not Understand the Leachate Dispersed from the Tybouts Corner Landfill To Be a Harmful or Toxic Substance at the Time of the Contract.

 Another question that remains is what the parties understood about the leachate from the Tybouts Corner landfill at the time of the insurance policy. CNA argues that there was knowledge at that time that wastes from the landfill should not come into direct contact with the water table and therefore that leachate from landfills was thought to be a pollutant. In support of this position, CNA points to the publication *Sanitary Landfill Facts.* The publication, which represented the state of the art at the time, devoted one paragraph to water pollution. The possibility arises, according to the publication, under certain geological conditions if solid waste is brought in direct contact with groundwater. CNA Appendix ("App."), D.I. 574 at A000043. Testimony at the trial confirms the fact that officials had an idea that waste should be kept above the seasonal high water mark. *See New Castle III,* 725 F.Supp. at 804.

Our findings of fact in *New Castle III* show that there was no understanding of the environmental hazards from the drainage of leachate on the part of either landfill operators or the insurance companies at the time of the landfill's construction.[8] *Id.* at 804. No scientific studies of the problem existed in the eastern United States at the time; no mathematical models of leachate creation or migration existed; no technology for leachate control had been developed; knowledge of leachate formation was not widespread; and regulations in 1969 did not address leachate. *Id.* at 803–04. At the time the primary concern was direct-contact problems, such as rodents, litter, odors, etc. *Id.* at 804.

Although direct contact between municipal waste and water was an acknowledged potential danger at that time, professionals believed that drainage from landfills did not pose such a danger. In the publication that CNA cites, *Sanitary Landfill Facts,* drainage is not discussed in the context of water pollution. CNA App., D.I. 574 at A000043. Drainage is deemed important

---

8. The credible factual record provides no reason to conclude that the parties' understanding about the dangers of leachate dispersion from Tybouts Corner changed significantly during the time the landfill was operating and up to the time CNA's policies were issued because of changes in general knowledge about leachate that were recognized by government agencies, by the insurance industry, or by landfill experts.

because it "will prevent runoff water from eroding the cover material and exposing the wastes." CNA App., D.I. 574 at A000042. The belief at the time was that landfills purified themselves through a process of soil filtration. *New Castle III,* 725 F.Supp. at 804. Because of this process of soil filtration, professionals believed that this type of leachate, to the extent they were aware of the term, was not a pollutant. Although this distinction appears to be faulty in light of today's knowledge, it reflects the lack of knowledge about leachate at the time.[9]

The events that occurred at the landfill itself also do not lead to a conclusion that the operators of the Tybouts Corner landfill knew about the potential danger of the leachate. CNA alludes to events that they claim show knowledge that the leachate from Tybouts Corner posed great danger. This Court's previous findings of the most serious of these events, the University of Delaware reports, the black pond incident, and the Winterim report, indicate that the events did not demonstrate to the operators of the landfill that the leachate dispersed from Tybouts Corner was a substance that posed a realistic threat to the surrounding environment. *Id.* at 815–16. This Court examined the events from 1968 to 1975. *Cf. id.* at 814 ("CNA has not shown that it was *expected* in the period from 1968 to 1975 that chemical waste would exacerbate a leachate problem. In fact, the evidence indicates the contrary.") None of the events during that time, which extended to the time the policies were issued, demonstrate that the parties understood the leachate dispersed from Tybouts Corner to pose a serious risk of contamination to the surrounding environment. Reports confirmed that "the landfill was behaving in a manner consistent with its design." *Id.* at 816. The University of Delaware reports, for instance, actually concluded that there was every reason to believe that pollutants were *not* being dispersed from the site. *Id.*

## IV. CONCLUSIONS OF LAW

### A. The Court Must Consider Whether the Leachate From the Tybouts Corner Landfill Was Understood To Be a Contaminant.

The issue presented on remand is whether the County expected the discharge or release of contaminants into or upon the land, or any watercourse or body of water. In interpreting the meaning of the words used in this formulation of the issue, the Court must consider the fact that the question is derived from a contract between the two parties. This contract excluded coverage for the following:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

*New Castle I,* 673 F.Supp. at 1362 n. 4. Thus, if the County did "expect[ ] Tybouts Corner landfill to discharge or release contaminants into or upon the land or any watercourse or body of water" as these terms are used under the contract, coverage would be excluded.[10]

9. The definition of leachate adopted by this Court and the Third Circuit demonstrates that leachate need not carry pollutants, only "soluble or suspended matter." *New Castle III,* 725 F.Supp. at 803 n. 4; *New Castle V,* 933 F.2d at 1167 n. 5. Under this definition an aqueous solution carrying innocuous mineral particles may constitute leachate. Just as the Court could not equate such a clearly innocuous substance with the leachate dispersed from the Tybouts Corner landfill, the Court cannot equate the leachate dispersed at Llangollen with the leachate dispersed at Tybouts Corner. The discharges at Llangollen landfill involved different

circumstances and played a part in establishing theories of leachate production and migration in Delaware. *New Castle III,* 725 F.Supp. at 815–16. They are not relevant for the purposes of this decision.

10. The Court will use the term "contaminant" rather than "irritant[ ], contaminant[ ], or pollutant[ ]", which is used in the contract. For the purposes of this case, all of the terms may be defined as "a toxic or particularly harmful material which is recognized as such in industry or by government regulators." *Westchester Fire Ins. Co. v. City of Pittsburgh, Kansas,* 768

Several factors suggest the necessity of addressing the question of whether leachate should be considered a contaminant under the contract. The Third Circuit used the term in forming its question for remand. In addition, the pollution exclusion clause excludes coverage for damage arising from the discharge of "smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials *or other* irritants, contaminants or pollutants." The wording of the clause shows that the substance released must constitute an irritant, contaminant, or pollutant to give rise to the exclusion, and each term of the contract should be given meaning in its interpretation. *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 286 (Iowa 1990). Without this limitation, the clause would go far beyond the purpose of the exclusion, which is to place the risk and thus the incentive to take precautions upon the insured when releasing dangerous substances. *See New Castle V*, 933 F.2d at 1202. If a substance is not recognized in industry or by governmental regulators as a potentially toxic or harmful to the environment, no incentive is provided by placing the risk upon the insured. In addition, numerous other courts have refused to equate the release of contaminants with the release of other substances. *See, e.g., Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co.*, 347 So.2d 95, 100 (Ala.1977) (sand and mud); *U.S. Fidelity & Guar. Co. v. Armstrong*, Jud.Council Coord.Proc.Case No. 1072, slip op. at 18–19, Decision on Phase IV Issues (Cal.Super.Ct. Aug. 29, 1988) (asbestos); *A–1 Sandblasting & Steamcleaning Co. v. Baiden*, 53 Or.App. 890, 632 P.2d 1377, 1379 (1981), *aff'd*, 293 Or. 17, 643 P.2d 1260 (1982) (paint).

■ The focus on this issue does not merely restate the occurrence clause, as CNA contends. One may knowingly discharge a pollutant without the expectation of environmental damage. In order for the substance to be a pollutant, a person need only know the substance dispersed has a realistic *potential* for environmental damage. *See, e.g., Town of Tieton v. General*

*Ins. Co. of North America*, 61 Wash.2d 716, 722, 380 P.2d 127 (1963) (the insured "took a calculated business risk" that no damage would occur). The fact that a substance actually causes damage does not make it a contaminant; the substance must be "a toxic or particularly harmful material which is recognized as such in industry or by governmental regulators." *Westchester Fire Ins. Co. v. City of Pittsburgh, Kansas*, 768 F.Supp. 1463, 1464 (D.Kan.1991). The question is whether the leachate from the Tybouts Corner landfill can be considered such a substance.

B. *The Parties' Understanding of the Term "Contaminant" Is Determined By What Was Recognized To Be a Contaminant at the Time the Contract Was Made.*

■ The burden is on the insurance company seeking to deny coverage to show that the substance in question was a contaminant. *In re Hub Recycling, Inc.*, 106 B.R. 372, 375 (D.N.J.1989). The County argued that because leachate was not recognized as a contaminant, it should not be considered a contaminant under the contract. CNA argues that there is no requirement that leachate was a known contaminant; the condition of the clause is satisfied if the leachate can now be regarded as a pollutant. Knowledge, they argue, adds an element that is not expressed in the clause. *See United States Fid. & Guar. Co. v. Murray Ohio Mfg. Co.*, 693 F.Supp. 617, 622 (M.D.Tenn.1988), *aff'd*, 875 F.2d 868 (6th Cir.1989) (motive for dispersing pollutants not relevant under the clause). CNA then recites instances where, with the benefit of hindsight, this Court and various witnesses describe the potential dangers of the leachate from the Tybouts Corner landfill. *See, e.g., New Castle III*, 725 F.Supp. at 814 ("CNA offered unrefuted evidence … that leachate would have eventually caused property damage even had all chemical waste been turned away from the site.").

■ More precisely, the question is not the addition of an element of motive or

F.Supp. 1463, 1464 (D.Kan.1991). In the Court's judgment, no distinction between the terms would alter the result in the case. Furthermore,

the use of the term "contaminant" follows the language that the Third Circuit used in formulating the mandate to this Court.

knowledge, but the meaning of the terms under the contract. The interpretation of contracts is not based on an objective interpretation, but "with the meanings attached by each party *at the time the contract was made.*" E. Allan Farnsworth, 2 *Farnsworth on Contracts* 244 (1990) (emphasis added). Insurance contracts are interpreted under the same principle. *See Calcasieu–Marine National Bank v. American Employers' Ins.,* 533 F.2d 290, 295 (5th Cir.1976), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

 The Court concludes that the parties' understanding of the term "contaminant" is determined by what was recognized as a contaminant at the time the policies were issued in the early 1970s. One might contend that the County assumed the risk that a substance might be discovered to be a pollutant, but such a reading is not compelling. First, since the risk that a certain substance will later be discovered to be a pollutant is not reasonably foreseeable, it is not the kind of risk that is normally understood to be placed on the insured. *See* Robert D. Chesler, Michael L. Rodburg, and Cornelius C. Smith, Jr., *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability,* 18 Rutgers L.J. 9, 14 (1986) ("[C]ourts have primarily sought to determine whether or not the resulting damage was actually expected or intended by the insured or was so readily foreseeable as to reflect a business risk assumed by the insured."). Second, if there are two reasonable readings, the term is ambiguous and will be construed to the benefit of the insured and against the insurer that drafted the policy. *Aetna Casualty and Surety Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990).

This reading is also consistent with the purpose of the clause. The Third Circuit found that pollution exclusion clause provides "a strong incentive to take precautions designed to minimize the risk of environmental damage." *New Castle V,* 933 F.2d at 1202. The clause creates this incentive by denying coverage to "those who knew or should have known their action

would cause harm." *Grinnell Mut. Reins. Co. v. Wasmuth,* 432 N.W.2d 495, 498 (Minn.Ct.App.1988). No incentive is provided to minimize risk where the parties could not have known that the substance dispersed from a site posed a danger. This fact is illustrated by this case, for here the County used the most sophisticated technology and expertise available at the time and still believed that the drainage of leachate did not pose a danger. What remains is the principle of the primary policy, which gives coverage for unexpected and unintended losses.

## V. CONCLUSION

Based on the credible evidence adduced at trial, the Court finds that CNA has not overcome its burden of proving by a preponderance of the evidence that the County expected to discharge or release contaminants into or upon the land or any watercourse or body of water. The County is therefore entitled to a declaratory judgment that the pollution exclusion (exclusion f) does not apply to the sums that the County becomes obligated to pay arising from (1) *United States v. New Castle County,* Civil Action No. 80–489, (2) *Andrews v. New Castle County,* Civil Action No. 84–124, and (3) *Wagner v. New Castle County,* Civil Action 7008.

For the foregoing reasons, an appropriate Order will be entered.