NEW CASTLE COUNTY

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation of the State of Connecticut, Home Insurance Company, a corporation of the State of New Hampshire, New Hampshire Insurance Company, a corporation of the State of New Hampshire, Continental Casualty Company, a corporation of the State of Illinois, United States Fire Insurance Company, a corporation of the State of New York, Insurance Company of North America, a corporation of the State of Pennsylvania, Continental Insurance Company, a corporation of the State of New Hampshire, United States Liability Insurance Co., a corporation of the State of Pennsylvania, National Union Fire Insurance Company, a corporation of the Commonwealth of Pennsylvania, Twin City Fire Insurance Company, a corporation of the State of Minnesota, Aetna Casualty and Surety Company, a corporation of the State of Connecticut, and Zurich Insurance Company, A Swiss corporation,

Continental Casualty Company ("CNA"), Appellant.

No. 91–3857.

United States Court of Appeals, Third Circuit.

Argued June 18, 1992.

Decided July 28, 1992.

As Amended Aug. 4, 1992.

Arthur Makadon (argued), Geoffrey A. Kahn, Walter M. Einhorn, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Michael J. Goodrick, John G. Mulford, Theisen, Lank, Mulford & Goldberg, Wilmington, Del., for appellant.

Thomas W. Brunner, Wiley, Rein, Fielding, Washington, D.C., for amicus-appellant.

George H. Seitz, III, Prickett, Jones, Elliott, Kristol & Schnee, Lydia F. Anderson, New Castle County Law Dept., Wilmington, Del., Joseph D. Tydings (argued), Catherine J. Serafin, Anderson, Kill, Olick & Oshinsky, Washington, D.C., for appellee.

William H. Allen, Covington & Burling, Washington, D.C., for amici-appellee.

Before: GREENBERG and NYGAARD, Circuit Judges, and POLLAK, District Judge.*

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

This diversity case is a protracted insurance dispute which has spanned seven years and produced six published opinions. This one makes seven. Continental Casualty Company appeals from a declaratory judgment in favor of New Castle County declaring that under the comprehensive general liability insurance policy Continental has a duty to defend and indemnify New Castle for liability incurred when it discharged pollutants. The district court reasoned that because New Castle was un-aware the substance it discharged was a contaminant, the pollution exclusion clause did not apply. The parties raise many issues and assignments of error. The sole issue is really whether the term "contaminants" in the pollution exclusion clause carries an implied scienter element. We hold that the term is plain and unambiguous under Delaware law and when a polluter discharges contaminants, whether or not he knows them to be contaminants, coverage is excluded under the insurance policy. We will reverse and remand with instructions to enter a judgment for Continental.

### I.

We will recapitulate the facts and procedures only insofar as they are necessary to decide the narrow issue before us. For a complete factual recitation and procedural history, see *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1167–76 (3d Cir.1991) (*New Castle V*); *New Castle County v. Hartford Accident & Indem. Co.*, 778 F.Supp. 812, 813–14 (D.Del.1991) (*New Castle VI*).

New Castle had been insured by twelve insurance companies against liability for damages caused by discharging pollutants. The policies issued were post–1970, comprehensive general liability insurance policies and were standard throughout the insurance industry. Only two provisions of the policy need discussion, the "occurrence" and "pollution exclusion" clauses. The occurrence clause provides coverage for the insured for damages "caused by an occurrence." An occurrence is defined as an accident that during the policy period results in damage "neither expected nor intended" by the insured. The pollution exclusion clause, however, excludes coverage for damage arising out of the "discharge ... of ... contaminants"; but coverage is still provided if "such discharge ... is sudden and accidental."

New Castle had incurred liability in three separate lawsuits, the gist of which being

---

* Honorable Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

that New Castle poisoned the local drinking water when it discharged leachate from two landfills, Langollen and Tybouts Corner. New Castle filed this action against. its twelve insurers and sought a declaration that they must defend and indemnify it. The insurers denied coverage. New Castle eventually settled with all the insurers except Continental.

The issue of whether Continental must defend and indemnify New Castle for damages caused by the Tybouts Corner operation was tried before the district court without a jury. The court upheld a previous ruling that the term "sudden and accidental" in the pollution exclusion clause was ambiguous under Delaware law and construed it to mean "unexpected." *New Castle County v. Continental Casualty Co.*, 725 F.Supp. 800, 813 (D.Del.1989) (*New Castle III*) (citing *New Castle County v. Hartford Accident & Indem. Co.*, 673 F.Supp. 1359, 1364 (D.Del.1987) (*New Castle I*)). Since both the pollution exclusion and the occurrence clauses focus on the intent of the insured, the court conflated the two clauses into a single inquiry of whether New Castle expected pollution damage. Id. The district court found that New Castle did not expect off-site pollution to occur. It therefore held that an occurrence had taken place, that the pollution exclusion clause did not exclude coverage, and that Continental had a duty to defend and indemnify New Castle in the three underlying lawsuits. Id. at 816. Continental appealed.

We upheld the determination that an occurrence took place and triggered the insurance coverage. *New Castle V*, 933 F.2d at 1191–92. We also upheld the conclusion that the term "sudden and accidental" in the pollution exclusion clause was ambiguous and we construed it to mean "unexpected and unintended." Id. at 1192–98. But we held that the district court erred when it considered the occurrence and pollution exclusion clauses coextensive. Id. at 1162. We distinguished the occurrence clause, which focuses on *damage*, from the pollution exclusion clause, which focuses on *discharge*. The crux of this distinction is: The occurrence clause provides coverage when the damage was unexpected and unintended, though caused by an intentional act, whereas the pollution exclusion clause excludes coverage except when the discharge was unexpected and unintended. So an insured can point to unexpected and unintended damage as a result of a deliberate act of discharge, and therefore have an occurrence, yet still be excluded from coverage because the discharge was expected and intended.

We concluded that the damage/discharge distinction could prove dispositive because there is evidence that New Castle, while not expecting the Tybouts Corner landfill to produce off-site environmental damage, did expect the landfill to discharge leachate. Id. at 1202. Because the district court treated the two clauses as coextensive, it never decided whether New Castle expected the discharge of pollutants. We remanded to determine "whether the County expected the Tybouts Corner landfill to discharge leachate." Id.

The district court on remand found, and New Castle did not seriously dispute, that New Castle knowingly discharged leachate. But for the first time New Castle raised a distinction between "leachate" and "contaminant." *New Castle VI*, 778 F.Supp. at 817. New Castle asserted that while leachate, the substance it discharged, is widely known today to be a contaminant, it did not know this at the time of the discharge or contract formation.

The parties did not dispute the definition of leachate, an "aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, underlying mineral strata, or other materials." *New Castle V*, 933 F.2d at 1167 n. 5; *New Castle III*, 725 F.Supp. at 803 n. 4. Nor did they contest that leachate *is* a contaminant; but they vigorously disputed the meaning of the term "contaminants." The district court agreed with New Castle and construed the pollution exclusion clause as excluding coverage only if the insured discharged a substance known to be a contaminant at the time of contract formation. *New Castle VI*, 778 F.Supp. at 820. It then found that New

Castle was unaware leachate was a contaminant at that time and therefore the insurance policy still covered New Castle.

Continental appeals again, contending (1) that New Castle waived the "known contaminant" argument, (2) that we determined in *New Castle V* leachate fell within the meaning of the term "contaminants," (3) that the clause is unambiguous and neither distinguishes nor qualifies the term "contaminants," and (4) that even if New Castle's argument is accepted New Castle knew leachate was a contaminant at the time of contract formation.

In this appeal we will assume, without deciding, that New Castle did not waive the right to raise the "known contaminant" theory and that we did not determine that leachate fell within the meaning of the term "contaminants" in *New Castle V*.[1] The sole issue we need to address is whether the term "contaminants" in the pollution exclusion clause is plain and unambiguous, or whether it can be reasonably construed to contain a scienter element, that is, read so that the clause excludes coverage only if the insured discharges what is known to be a contaminant.

## II.

■ Since the Delaware Supreme Court has yet to address this issue, we must predict how that court would decide it. The correct construction of an insurance policy is a question of law, and we have plenary review. *New Castle V*, 933 F.2d at 1183. See *Rohner v. Niemann*, 380 A.2d 549, 552 (Del.1977).

■ When the language of an insurance policy is clear and unambiguous, Delaware applies ordinary principles of contract law. The parties are bound by the plain meaning of the policy, because manufacturing an ambiguity creates a new contract with rights, liabilities and duties to which the parties did not assent. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del.1982). The court cannot contort the plain meaning of a policy term under the guise of construing it. *Apotas v. Allstate Ins. Co.*, 246 A.2d 923, 925 (Del.1968).

■ An ambiguity exists only when the language is subject to two or more reasonable interpretations. *Cheseroni v. Nationwide Mut. Ins. Co.*, 402 A.2d 1215, 1217 (Del.Super.1979), aff'd 410 A.2d 1015 (Del. 1980). An ambiguity does not exist merely because two conflicting interpretations may be suggested; the insured must proffer more than a *"possible* construction of the policy." *Aetna Casualty & Surety Co. v. Kenner*, 570 A.2d 1172, 1174 (Del.1990) (emphasis in original). Because ambiguity lurks in every word, sentence, and paragraph in the eyes of a skilled advocate, absent a showing that the term has acquired a special meaning the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, not in a hypertechnical fashion, but in an ordinary, common sense manner. See *New Castle V*, 933 F.2d at 1188; 2 Couch, Couch on Insurance 2d, § 15:17 at 177–78, 190 (Rhodes rev ed 1984).

1. We question, however, why New Castle raised the "known contaminant" theory so late in this litigation. Everyone, including this court and the district court, presumed that since leachate is in fact a contaminant it fell within the term "contaminants." Even if this was an undetermined proposition, it was certainly a natural assumption. New Castle could have notified Continental and the district court in *New Castle I* that Continental has "failed" to establish an essential element of the pollution exclusion clause, the applicability of which the district court specifically analyzed. At the very latest, it could have raised the issue during the bench trial, which was memorialized in *New Castle III.*

Yet it waited five years, when it was at the brink of losing, before bringing this issue. Had it done what it should have, the issue would have been addressed in *New Castle V* and this appeal (*New Castle VII*) may have been unnecessary. While we choose not to decide the waiver issue, this kind of eleventh hour concoction undermines judicial economy as well as the responsible (or irresponsible) litigant's credibility with the court, irrespective of the rules of waiver that may or may not be applicable in these circumstances. Litigants are admonished to refrain from this kind of careless or dilatory practice. All issues that are contested should be brought before the court as early as possible.

■ We begin with the policy term in question. The pollution exclusion clause states in full:

It is agreed that the insurance does not apply to bodily injury or property damage arising out of the *discharge,* dispersal, release or escape [collectively "discharge"] *of* smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, *contaminants* or pollutants [collectively "contaminants"] into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if *such discharge,* dispersal, release or escape *is sudden and accidental.*

(Emphasis added.)

Plainly, neither the dictionary definitions nor the popular usages of the substances named in the "contaminants" term require that we read a scienter element into them. But a word or a term cannot be considered in isolation; it must be read in the semantic and functional context of the policy or clause at issue to determine if two competing, reasonable interpretations exist. See *Cheseroni,* 402 A.2d at 1217.

The pollution exclusion clause analytically contains two parts: coverage is excluded if there is a "discharge ... of ... contaminants"; but it is reactivated if "such discharge" is sudden and accidental. We interpreted "sudden and accidental" to mean "unexpected and unintended." *New Castle V,* 933 F.2d at 1192–98. This term imputes a scienter element. The issue is whether this scienter element modifies "discharge" only or whether it modifies "contaminants" as well.

Nowhere does the clause provide that coverage is reactivated if such "discharge, dispersal, release or escape *of contaminants* is [unexpected and unintended]." The clause instead provides: "but this exclusion does not apply if such *discharge,* dispersal, release or escape is [unexpected and unintended]." Under the plain terms of the clause, "unexpected and unintended" can only modify "discharge." The "known contaminant" theory is simply wrong. The insurance policy nowhere hints that the term "contaminants" carries with it a scienter element.

To accept New Castle's construction is also to accept the proposition that the policy excludes coverage for the insured only if it knowingly discharged known contaminants "into or upon land, the atmosphere or any *known* watercourse or *known* body of water," for there is no principled method to include the scienter element in one term of the clause but exclude it in the other. We refuse to contort the pollution exclusion clause to require every element of the pollution exclusion clause to carry an implied scienter element because the drafter chose to write the policy in plain English rather than qualify every term ad infinitum. The construction of the policy language suggested by New Castle, while a *possible* interpretation, is not a reasonable one.

Any lingering vestige of semantic ambiguity may be dissipated when the term is taken in context with the function of the policy or clause so that the construction of the term has one reasonable meaning. See 2 Couch on Insurance, §§ 15:16, 15:26 at 166–76, 209–14. In *New Castle V* we explained the raison d'être of the pollution exclusion clause. We there gave the following example of two hypothetical cities to illustrate the economics underlying the allocation of risk by the clause: The first city was insured for all unexpected pollution damage, whereas the second city was insured only for damage that arises from unexpected discharge of pollutants. We reasoned that the first city has no incentive to improve landfill operations and therefore presents a moral hazard, whereas the second is given such an incentive. Sound reason thus explains why the insurance industry would accept and underwrite the risk in the latter but not the former.

The district court believed, and New Castle contends on appeal, that no incentive is created to minimize risk where the parties could not have reasonably foreseen that the substance dispersed from a site posed a danger, implying that the parties understood the scheme under the pollution exclusion clause to exclude coverage only in

those circumstances where such incentive existed. *New Castle VI*, 778 F.Supp. at 820. That being so, the argument goes, our reasoning in *New Castle V* requires us to read a scienter element into the term "contaminants."

The district court misconstrued the hypothetical we gave in *New Castle V*. The example considered the problem in terms of incentives to illustrate how the parties allocated the risks. Its fundamental assumption was that the insured is always in the better position to cause or prevent the discharge of pollutants and therefore the pollution exclusion clause gives the insured an incentive "to take precautions designed to minimize the risk of environmental damages." *New Castle V*, 933 F.2d at 1202. "Viewed through this economic prism," we said, "it would be eminently rational for an insurer to underwrite the risk of pollution damage posed by the second city, but not the risk posed by the first." *Id.* The clause thus embodies an understanding that the insurer will only underwrite a certain, specific risk, calculable to a margin of actuarial certainty and rational from an economic point of view for both parties. (Indeed the entire insurance industry revolves around this simple concept. See 1 Couch on Insurance 2d, §§ 1.2–1.5 at 4–11.)

The allocation of risk is understood when we consider who is in the best position to curtail, control or minimize certain risks. The purpose of the occurrence clause is, of course, to shift the risk of loss to the insured when it intentionally pollutes with the expectation of damages. The purpose of the pollution exclusion clause is specifically to shift the risk of loss to the insured when it intentionally discharges contaminants. Both kinds of risks are neither calculable to a margin of actuarial certainty nor economically sound for the insurer to underwrite.

The pollution exclusion clause, like the occurrence clause, places on the insured those certain risks whose contingencies are within the control of the insured, but when they are not, the risks fall on the insurer. Thus, the pollution exclusion and occurrence clauses read together provide insurance coverage only when the damage *and* the discharge were unexpected and unintended.

New Castle contends, however, that when it discharged leachate into the environment, it is still entitled to coverage under the policy since that discharge is no more inculpatory than spilling "holy water." Moral culpability is irrelevant in the economic scheme of things. Should the holy water later turn out to be a witches' brew, as it did here, New Castle bears the risk of damage from the innocent but intentional act of pollution as that risk has been allocated by the parties and embodied in the pollution exclusion clause. When the term "contaminants" is read in the ordinary, common sense fashion, considering it in the semantic and functional contexts of the pollution exclusion clause, it has only one reasonable interpretation: Knowledge of the nature of the substance discharged is irrelevant.

In *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 781 F.Supp. 9 (D.D.C.1991), the insured contended that it did not know that the waste oil it discharged contained contaminants and therefore the pollution exclusion clause did not apply. Construing New York law, the district court rejected this argument and concluded the argument confuses the distinction between the occurrence and pollution exclusion clauses, turning the inquiry on its head from whether there had been a knowing discharge of contaminants into whether there had been a discharge of known contaminants, which inexorably goes to whether there has been an occurrence to trigger the policy coverage. *Id.* at 17 (relying upon *Powers Chemco, Inc. v. Federal Insur. Co.*, 74 N.Y.2d 910, 548 N.E.2d 1301, 549 N.Y.S.2d 650 (1989), and *Technicon Elec. Corp. v. American Home Assurance Co.*, 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989)).

In *Northern Ins. Co. v. Aardvark Assoc., Inc.*, 942 F.2d 189 (3d Cir.1991), the insured contended that the pollution exclusion clause applied only to "active" polluters (that is, those who "actually release pollutants") and not "passive" ones. Not-

ing that Pennsylvania law, like Delaware's, requires us to give effect to the plain and unambiguous terms of the insurance policy, we concluded that the pollution exclusion clause was clear:

> We have scrutinized this language for any hint that it is limited to "active" polluters or those who "actually release pollutants," but we find no ambiguity and no support for Aardvark's argument. The clause unambiguously withholds coverage for injury or damage "arising out of *the* discharge, dispersal, release or escape" of pollutants.

Id. at 194 (emphasis in original). Thus we refused to inject a qualification into a term that is plain on its face.

The *Aardvark* and *Independent Petrochemical* decisions, while not decided under Delaware law, construed the same pollution exclusion clause under Pennsylvania and New York laws. Both laws are similar to Delaware's in that the language of an insurance policy is enforced according to its plain meaning.[2] See *Technicon*, 74 N.Y.2d at 76, 544 N.Y.S.2d 531, 542 N.E.2d 1048; *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). The *Independent Petrochemical* court rejected the precise argument New Castle raises. This court in *Aardvark* rejected an insured's attempt to inject an unspecified element into the pollution exclusion clause.

### III.

We hold that the term "contaminants" in the pollution exclusion clause is unambig-

uous and carries no implied scienter element. Since the district court has decided the issue for which we in *New Castle V* remanded, that is to say, New Castle expected the discharge of leachate, the well of issues in this case, as deep as it may have been, has finally run dry and this seven year insurance litigation ends. We will reverse and remand with instructions to enter judgment for Continental.

---

**2.** Paradoxically, in *Aardvark* and *New Castle V* we construed the same "sudden and accidental" term of the pollution exclusion clause under Pennsylvania and Delaware plain meaning rules, and we arrived at different conclusions. In *New Castle V* we lacked guidance from the Delaware courts and predicted that the Delaware Supreme Court would conclude that the term "sudden and accidental" is ambiguous and would construe the policy to provide coverage if the discharge is simply "unexpected and unintended." A few months later, we held in *Aardvark* that while "accidental" connotes "unexpected and unintended," the word "sudden" imports an additional, temporal element, that being "abrupt" and lasting a short time. 942 F.2d at 193. This conclusion was predicated on deci-

sions of the Pennsylvania Superior Court, which reasoned that the term was "'clear and plain, something only a lawyer's ingenuity could make ambiguous.'" Id. at 192. Understandably, Aardvark relied on *New Castle V* to argue that coverage is reactivated if the discharge is unexpected and unintended regardless of whether it was short-lived. In rejecting this argument, we explained: "In *New Castle County*, without any specific guidance in Delaware case law, we predicted what the highest court of that state would do. Here, with strong guidance in decisions of the Superior Court of Pennsylvania, we feel constrained to reach a different conclusion." Id. at 193. The paradox is thus more apparent than real.